MARY D. WALRATH, PLAINTIFF IN ERROR, v. THE STATE OF NEBRASKA, DEFENDANT IN ERROR.

1. **Indictment for Murder:** PROOF. To justify a conviction under an indictment for murder, it must be proved either that the accused personally committed the deed, or else was present at its commission, aiding and abetting therein, or, in other words, was a principal in the *first* or *second* degree.

2. ————: ————. But facts showing that the prisoner was accessory only, whether before or after the fact, will not warrant a conviction under an indictment for murder.

3. **Admissions of Prisoner.** When the prosecutor depends upon the admissions of the prisoner to establish guilt, if they be reconcilable, and none are disproved, they must be taken all together.

4. **Principal in felony:** PRESENCE AT ITS COMMISSION. Evidence merely showing the accused to have been present at the commission of the felony, without more, is not sufficient to make him a principal therein.

5. **Error:** EVIDENCE: MOTION FOR NEW TRIAL. When the error complained of concerns the admission or rejection of testimony on the trial, the record must show that the alleged error was specifically assigned in the motion for a new trial. And it is not enough merely to allege—"For errors in the ruling of the court in allowing evidence objected and excepted to by the defendant."

6. ————: IMPROPER CONDUCT OF COUNSEL. If it be assigned for error that "the prosecuting attorneys improperly conducted themselves in the argument of the case to the jury," to the prejudice of the prisoner, the record must show that the particular matter complained of was brought to the attention of the court below, and was made one of the grounds of complaint in the motion for a new trial.

NOTE.—By statute, in various states, the common law rule requiring a prior conviction of the principal has been relaxed, and an accessory may be indicted or tried without averring or proving such conviction. *People v. Bearss*, 10 Cal., 68. 3 Greenleaf Ev., § 46.

By the Ohio Crimes Act, from which section one of the Nebraska Criminal Code of 1873 is taken, aiding, abetting, and procuring a crime to be committed is made a substantive, independent offense, not in any way dependent for its punishment on the conviction of the principal offender. *Noland v. The State*, 19 Ohio, 131.—REP.

7. **Instructions to jury.** Instructions to the jury must be based upon and be applicable to the evidence; and it is error to instruct the jury that they may find a material fact, of which there is no evidence from which it may be legally inferred.

8. **Confessions:** FACTS BROUGHT TO LIGHT BY. Any circumstance tending to establish the prisoner's guilt may be *proved*, although it was brought to light by an admission of the prisoner, inadmissible, *per se*, as having been obtained by improper influence.

9. **Separation of jury.** The court may, even in a capital case, permit the jury to separate during the adjournments of court, up to the final submission of the case to them. But when permitted to separate they should be admonished by the court as to their duty.

ERROR from the district court of Cheyenne county. The facts appear in the opinion.

*Heist, Ballou, Hinman, & Neville,* for plaintiff in error, cited *Milton v. The State,* 6 Neb., 145. *Spurgeon v. Clemmons,* Id., 307. *Palmer v. The People,* 4 Neb., 76. *Commonwealth v. Webster,* 5 Cush., 295. *Rainer v. State,* 33 Ga., 571. *People v. Campbell,* 40 Cal., 129. *Woods v. The State,* 43 Miss., 364. Gen. Stat. Neb., 830. *People v. Phillips,* 42 N. Y., 200.

*George H. Roberts, Attorney General,* for the state.

No brief filed.

LAKE, J.

The plaintiff in error was indicted jointly with one Harry Dubois for the crime of murder in the *first* degree, in shooting to death Charles Phillips. On a separate trial she was convicted of murder in the *second* degree, and sentenced to the penitentiary for the term of ten years. She now brings the case here, alleging several errors as grounds for a reversal of the judgment.

8

The first error assigned is that the verdict is not sustained by the evidence. We have carefully examined the evidence as preserved by the bill of exceptions, and are clearly of opinion that this objection to the verdict is well taken. We find a total want of evidence to show that the prisoner either committed, or was present, aiding or abetting in the commission of the crime. The utmost that the evidence tends to establish against her is, that knowing of its commission by Dubois, she concealed the fact, and also harbored and protected him from prosecution. But this, if fully established, would only make her an accessory after the fact, a crime not charged by the indictment, and for which she was not on trial. The testimony may also have shown that Dubois had previously threatened to take the life of the deceased, in her presence.

To have justified a conviction under this indictment it was necessary for the prosecution to prove, either that the prisoner herself gave the fatal wound, or else was present, aiding and abetting in giving it. 2 Broom & Hadley's Com. (Am. Ed.), 353. In other words, she must have been what is known in criminal jurisprudence as a principal, either in the *first* or *second* degree. The theory of the prosecution seems to have been that she was the latter. Principals in the *second degree* are those who did not with their own hands commit the act, but were present aiding and abetting it. 3 Greenleaf on Ev., Sec. 40. 1 Hale P. C., 615. But facts showing the prisoner to have been an accessory only, whether before or after the fact, would not warrant her conviction under an indictment charging her as principal. *State v. Wyckoff*, 31 N. J., 65. *Connaughty v. The State*, 1 Wis., 159. *Hughes v. The State*, 12 Ala., 458. 1 Bish. Crim. Law, Sec. 663.

The only evidence upon which reliance was placed as connecting the prisoner with the homicide, in any

manner, consisted of so called "confessions" made just previous to, and at the time of her arrest. The most of these confessions however, after having been erroneously admitted, were very properly excluded, so far as they could be, from the consideration of the jury on the ground that they were not voluntary. The principal ones not excluded were the following, viz:

William Radcliff, a witness called by the state, in answer to a question by the district attorney, said: "I asked her (the prisoner) where Charley (the deceased) was. She stopped awhile and did not speak for some time; then she said, if she had a friend she had a secret to tell him. Then she said Charley was not a thousand miles from there, and told me that by going down a mile or a mile and a quarter from the ranch I would find where he had been killed."

Q. How did she say you would find the place?

A. Well there was a small clump of trees about a mile from the house, and she said if I would go down there I would find where he had been killed; and if I would uncover that pile of sand that was there I would find blood and then I would see a trail that led to the river.

Q. Did she say how he had been killed?

A. Yes, sir. She did.

Q. Well how was it?

A. She said he had been shot.

Q. Well, go on.

A. She told me if I would go over to the bridge I would find some cartridges that were shot out of a pistol. She told me where he was shot, right here, pointing to her cheek and neck; and she said those who did that ought to be punished.

This witness then went on and narrated how, in accordance with the prisoner's directions thus given, he made search and found the blood, cartridges, and a

trail leading to the river, such as would be made by dragging some object over the ground. And this disclosure led to the discovery of the body of the deceased shortly afterward, in the river a short distance from where this trail struck the water's edge.

On cross-examination the following facts were drawn out from this witness:

Q. Did she not state to you during that conversation that she was afraid of Dubois?

A. Yes, sir. She did.

Q. Did she tell you not to tell Dubois what she had told you?

A. Yes, sir.

Q. Did she state as a reason she had not told this before was fear of Dubois?

A. Yes, sir.

Q. Did she state to you how she had learned these facts?

A. Yes, sir. She did.

Q. How was it?

A. She told me that Dubois told her.

It was also proved that Dubois and Phillips for some months before and at the time of the murder were living with the Walraths, and that Dubois remained there and seemed to be upon very intimate terms with the family up to the time of his arrest.

Also, M. C. Cook, a witness called by the prosecution, testified:

Q. Well, go on and give the particulars of the conversation.

A. She (Mrs. Walrath) told me she had a secret to tell me—that if I would not tell she would tell me. She told me that Charley Phillips was murdered; and told me where he was murdered. She said he was murdered down by some little willow trees; that he

was murdered there, then dragged south and thrown into the river.

Q.  How did she say he was killed?

A.  She said that he was shot.

Q.  Who by and how?

A.  She did not say how.  She said that he went out without Harry Dubois; she said that Dubois told him that he had a hand in the train robbery at Big Spring station; that he had money hidden there; he told him if he would go out with him that night he would make him wealthy; that he had the money buried.  She said they had a fight a few nights before, and that Phillips was afraid of Dubois; that Phillips told he was going out that night, and was afraid of Dubois, and wanted her promise to see to it, that if anything came out wrong, to have it cleared up.  She said that when they got down to the place where he was killed, Dubois said to Phillips, " What is that coming down the railroad?"  Phillips turned to look, when he was shot twice—once in the cheek as he turned his head to see, and then in the neck.

Q.  Did she say what he was shot with?

A.  She did not say.

Q.  Did she say what arms they took with them from the house?

A.  Yes, sir.  That Phillips took a Winchester rifle, and Dubois a revolver.

Q.  How did he fall?

A.  She did not say how he fell, but that he was shot down, and then dragged down, and thrown into the river.

Q.  Did she say who shot him?

A.  No, sir.

Q.  State anything else that was said?

A.  She told me that she had heard Harry Dubois say, a day or two before, that he was going to kill

Phillips, but she did not believe he had the sand to do it.

On cross-examination.

Q.    Did she state to you that she was afraid of Dubois?

A.    She said something about being afraid of him.

Q.    Did she not caution you not to tell Dubois until after he was arrested?

A.    She said something like that; I don't remember what exactly.    She said she was afraid of Dubois, and was afraid to be out, that he would kill her.

Q.    Did she tell you how she learned the facts of the killing?

A.    No, sir.

Also the witness Radcliff testified for the prosecution as to certain statements of the prisoner as follows:

Q.    Now state if she made any statements to you as to where you would find Phillips' clothes that he wore at the time he was killed?

A.    Yes, sir, she did.

Q.    Where did she say you would find them?

A.    Well, I can't say that she told me where they could be found.

Q.    Where did she say she directed them to be put?

A.    In a slough behind the house.

Q.    Mr. Radcliff, did you have any conversation with the defendant in relation to her knowledge of Phillips going to be killed?

A.    Yes, sir.

Q.    State what the conversation was?

A.    She said she knew it was going to happen.

Q.    How long had she known it?

A.    Ten days or two weeks.

On cross-examination:

Q.    When she told you that she knew of this, did she not speak of it in this way, "That Dubois had made threats, but she did not believe he would do it?"

A. I believe some such words as that.

Q. ' Did she not make use of this remark, "that she told Dubois he had better burn the pants, when he wanted to wash them?" Was not this said, "That she told Dubois that he had better burn the clothes?"

A. Yes, sir, she made the remark.

From this narration of the only testimony on which the jury could possibly have based their finding, the propriety of what we said at the outset as to the failure of the evidence to establish the prisoner's guilt as a principal in the homicide, will be clearly perceived.

It is a settled rule of criminal evidence that, where the prosecutor depends upon the admissions of the prisoner to establish his guilt, if they are reconcilable, and none of them disproved, they must be taken altogether. 1 Greenleaf on Ev., sec. 218. The admission by the defendant of a fact disadvantageous to himself will not be received without receiving at the same time his contemporaneous assertion of a fact favorable to him, not merely as evidence that he made such assertion, but admissible evidence of the matter thus alleged by him in his discharge. Whar. Am. Crim. Law, 188. Therefore her declaration that all the facts which she disclosed concerning the killing of Phillips were communicated to her by Dubois being wholly uncontradicted, and entirely consistent with her other statements, should be taken and given equal credit with them.

Again, it will be noticed that in none of these "confessions" does she represent herself as being an actor, nor is there a syllable of other testimony to show that she was; so that, even if she had omitted the statement that her knowledge of the affair was derived from Dubois, the most that could reasonably be inferred from them is, that she was so near as to have been an eye witness of the transactions which she related. But

mere personal presence at the commission of a felony, without more, is not sufficient to make one a principal. *Connaughty v. The State, Supra.* *People v. Ah Ping,* 27 Cal., 489.

The second error complained of is, that the court erred in admitting certain testimony against the objection of the prisoner. While the assignment in the petition in error is sufficiently explicit, we find that, in the motion for a new trial, no mention whatever was made of the particular testimony to which objection was made. Not so much even as the name of a single witness whose testimony was deemed inadmissible was given. The assignment in the motion was simply, "for errors in the ruling of the court in allowing evidence objected to by defendant, and excepted to by defendant."

Section 490 of the code of criminal procedure provides for a new trial after a verdict of conviction; and one of the reasons for which it may be had is "error of law occurring during the trial." Section 491 provides that, "The application shall be by motion upon written grounds," etc. The evident intention in requiring the motion to be in writing was to fully apprise the judge to whom it might be addressed of the matters claimed to be erroneous, and on which the party complaining relies for a new trial. This assignment did not do this, for, notwithstanding the motion, the judge could not have known just what evidence was intended to be reached by it without resorting to an oral explanation by counsel. And even if such explanation were given, this court would have no means of knowing that the question presented here was the same as that raised and passed upon in the court below. The proceeding by which this is here is one of review only. Under it the only questions proper for our consideration are those that have been first

ruled on in the court whose record is before us, and the record itself must show the questions to be such. The presumption is that no prejudicial error has been committed, and it is not too much, indeed good practice demands it, to require a party who complains of such errors to point them out so distinctly in his motion for a new trial as to advise the court of just what he relies on. The rule in this particular is the same as in civil cases. Therefore the alleged errors in the admission of evidence will not be considered.

The *third* assignment is, "Because the prosecuting attorneys improperly conducted themselves in the argument of the case, in urging to the jury statements which the court had excluded from the evidence, as a reason why the defendant should be convicted." What we have just said as to the *second* assignment is applicable here. It is not shown that this matter was brought to the attention of the court below, either at the time of the alleged improper conduct, or in the motion for a new trial. Therefore no question is raised for this court to pass upon.

The *fourth* error assigned relates to certain instructions given to the jury on the law of the case. Our attention is called to but two, the first of which was in these words: "To warrant you in finding a verdict of guilty under the indictment herein, you must find from the evidence in the case that the defendant, Mary D. Walrath, either with her own hands and physical agency committed the homicide as charged, or was present when it was done, aiding, abetting, or procuring the same to be done by another. It is not necessary, however, that her presence be a strict, actual, immediate presence, so as to make her an eye witness of the homicide. It is enough if her presence be constructive. If you are satisfied there was a previous understanding or conspiracy entered into between the

defendant and any other person or persons to commit the homicide, and pursuant thereto the defendant took the part agreed upon and assigned her therein by common design, either in watching at proper distance to prevent surprise, or in enticing the deceased away, or took any other part assigned pursuant to prior agreement, and by words, deeds, personal presence, or any overt act contributed thereto, and was so near that she could and did by her personal presence, words, acts, or deeds, carry out the part previously assigned her, you will be warranted in finding her guilty, just the same as you would the person who actually committed the homicide with his own hands. But you must find she was in a situation in which she might by personal presence render assistance in some manner to the commission of the deed, and this, too, by design and agreement with the principal and actual perpetrator prior to the homicide."

This instruction was clearly erroneous, for, as before shown, there was no testimony on which to predicate it. Instructions must be based upon and be applicable to the testimony. *Meredith v. Kennard*, 1 Neb., 312. *Myer v. M. P. R. R. Co.*, 2 Neb. 319. The jury were given to understand by this instruction that there was evidence before them from which the prisoner's guilt as a principal offender might legally be inferred. In *Parks v. Ross*, 11 How., 362, the court say: "It is undoubtedly the peculiar province of the jury to find all matters of fact, and of the court to decide all questions of law arising thereon. But a jury has no right to assume the truth of any material fact without some evidence legally sufficient to establish it. It is therefore error in the court to instruct the jury that they may find a material fact, of which there is no evidence from which it may be legally inferred."

By this instruction, however, the jury were in effect

told that there was evidence before them from which they could legally find that a conspiracy had been entered into between the prisoner and some "other person or persons to commit the homicide, and pursuant thereto the defendant took the part agreed upon and assigned her therein." But the record contains no such evidence. Again, the jury were given to understand that there was evidence to show that the prisoner enticed the deceased to the place of the murder, and that she watched "at a proper distance to prevent surprise" while the deed was being committed, yet there was not a syllable of testimony that such was the fact. In these particulars the instruction was erroneous and clearly prejudicial to the prisoner.

The next instruction complained of is the *ninth.* Its language was: "All facts connected with the homicide, discovered and disclosed in consequence of the confessions of the accused, whether obtained by improper inducements or not, and so much of her confessions as distinctly relate to the facts connected with the alleged murder are proper for your consideration, and no more."

This instruction, in addition to being uncalled for by the state of the proofs, had, we think, a strong tendency to mislead the jury, by leaving them to infer that such facts might be established by illegal admissions alone. In connection with this charge they ought to have been told that before they could consider facts thus disclosed they must be clearly proven by testimony other than confessions of the prisoner improperly obtained, and which had been excluded from them. This caution was the more necessary by reason of the questionable practice which had been indulged in, of first admitting these improper admissions against objections, and afterward endeavoring to nullify their effect by formally excluding them from the jury. Any circumstance tend-

ing to show guilt *may be proved*, although it was brought to light by a declaration inadmissible, *per se*, as having been obtained by improper influence.   Phillips on Ev. (C. & H. and E. notes), 555, note 158, and cases there cited.

As to the alleged errors concerning the management and conduct of the jury, we find nothing at all prejudicial to the prisoner.   The court may, in a capital case even, permit the jury to separate during the adjournments of court up to the time of the final submission of the case to them.   But when permitted to separate they should be admonished by the court as to their duty, as directed in section 484 of the criminal code.   Gen. Stat., 830.

Several other questions of minor importance were raised, but in which we perceive no ground for complaint.   For the errors stated, the judgment must be reversed and a new trial awarded.

REVERSED AND REMANDED.