JOHN TAYLOR V. STATE OF NEBRASKA.

FILED OCTOBER 4, 1893. No. 4461.

1. **Homicide:** CONFESSIONS: EVIDENCE. A confession receivable in evidence, only after proof that it was made voluntarily, is restricted to an acknowledgment of the defendant's guilt, and the word does not apply to a statement made by the defendant of facts which tend to establish his guilt.

2. ——: FACTS DISCOVERED BY CONFESSIONS: ADMISSIBILITY. Any circumstance tending to establish the prisoner's guilt may be proved, although it was· brought to light by an admission of the prisoner, inadmissible of itself as having been obtained by improper influence.

ERROR to the district court for Lancaster county. Tried below before CHAPMAN, J.

*E. P. Holmes* and *Charles E. Magoon*, for plaintiff in error :

It was error to overrule the motion to strike out the sheriff's testimony. The confession was inadmissible. (3 Russell, Crimes [9th Am. ed.], 367 ; *Kelly v. State*, 72 Ala., 244; *Redd v. State*, 69 Id., 255 ; ·*Young v. State*, 68 Id., 569 ; *Commonwealth v. Knapp*, 9 Pick. [Mass.], 496 ; *Queen v. Doherty*, 13 Cox C. C. [Eng.], 23 ; *Reg. v. Bate*, ·11 Id. [Eng.], 686; *Reg. v. Warringham*, 2 Den: C. C. [Eng.], 447 ; *Sherrington's Case*, 2 Lew. C. C. [Eng.], 123; *Commonwealth v. Tuckerman*, 10 Gray [Mass.], 173 ; ` *Commonwealth v. Curtis*, 97 Mass., 578 ; *Commonwealth v. Taylor*, 5 Cush. [Mass.], 610 ; *Kennon v. State*, 11 Tex. App., 356 ; *Hopt v. Utah*, 110 U. S., 574.) There seems to have been an attempt to distinguish a difference between the alleged confession and what was said by the prisoner about the disposition of the gun. No difference, however, does exist, for the conversation is one and the same. The sheriff ought not to have been allowed to testify to the efforts made by the prisoner, under his direction, to find the gun,

because the gun was not found.    Not only were the alleged disclosures made under the influence of both hope and fear, but the alleged confession was found to have been false, in that the gun was not found.    The confession of a prisoner of the locality of stolen property, though induced by threats, is admissible when verified by finding the property where he locates it; and all he says in conveying the information which is directly connected with or explanatory of the discovery is also admissible, but his confession that he stole it is not admissible. (*Yates v. State,* 47 Ark., 172; *Davis v. State,* 8 Tex. App., 510; *Strait v. State,* 43 Id., 486; *White v. State,* 3 Heisk. [Tenn.], 338; *State v. Garvey,* 28 La. An., 925; *Laros v. Commonwealth,* 84 Pa. St., 200.)

*George H. Hastings, Attorney General,* for the state :

In the seventh paragraph of the motion for a new trial it is alleged that the court erred in allowing admissions made by defendant, but what admissions, by what witness narrated, what the subject-matter was, and whether material, relevant, or pertinent to the issue, the trial court was wholly uninformed, and the attention of the trial judge was not challenged to any particular error or series of errors by the motion for a new trial.    The statute, as well as the established rules of practice, requires a specific designation of the particular errors relied upon to be made in a motion for a new trial, and unless this requirement is observed, no foundation is laid for a review of questions raised and decided on the trial below. (*Midland P. R. Co. v. McCartney,* 1 Neb., 398; *Mills v. Miller,* 2 Id., 299 ; *Hull v. Miller,* 6 Id., 128; *Cropsey v. Wiggenhorn,* 3 Id., 108; *Lynam v. McMillan,* 8 Id., 135; *Republican V. R. Co. v. Hayes,* 13 Id., 491 ; *Uhl v. Robison,* 8 Id., 272 ; *Tomer v. Densmore,* Id., 384; *Lowrie v. France,* 7 Id., 191 ; *Phœnix Ins. Co. v. Readinger,* 28 Id., 587 ; *Rogers v. Rogers,* 46 Ind., 1 ; *Tucker v. Call,* 45 Id., 31 ; *Musselman v. Musselman,* 44 Id., 106 ; *Burdge v. Lewis,* 43 Id., 349.)

RAGAN, C.

John Taylor was convicted in the district court of Lancaster county of murder in the second degree, and sentenced to imprisonment in the penitentiary for life. The crime for which he was tried and convicted was the shooting on the night of April 22, 1889, of one Robert Woods. The murdered man was at the time at home in his bed. The fatal shot was probably from a double barreled shot gun, loaded with leaden slugs and fired through a window in Woods' house. The evidence on which Taylor was convicted was circumstantial. During the trial the state sought to prove by the sheriff a confession made to him by Taylor that he committed the murder. The court excluded the jury from the court room during the preliminary examination of the sheriff to ascertain whether the alleged confession was made under such circumstances as to be competent evidence against Taylor. On the return of the jury to the court room, and in their presence, the trial judge ruled out the offer of the state as to Taylor's confession and in so doing said: " The person that was in the cell with him was concerned to bring that about, and I have concluded, after looking the authorities up, that I will exclude the admission. I think it infringes on the rule in this one respect: The inducement that was offered by the party in view of the peril of mob that was hanging over him seems to have been the inducement, or at least, so far as the evidence shows, was the inducement for him to make his admission. The truth of the matter, if admitted, would be altogether left to the jury, and I am inclined to think, from the view of the authorities laid down by our supreme court, that I will exclude it. Here was a man put into the cell for the purpose of obtaining from him, by persuasion,—there is no evidence here that there was any authority given him to promise him anything, but at the same time he did volunteer the information there to him that

he was in danger, and that if he would make a statement, he would protect him, and that the sheriff would. It must be absolutely voluntary. That seems to be the rule laid down by the authorities. If the testimony had rested upon the officers,—if the testimony rested upon them alone,— I would unquestionably have admitted it. You are bound to recognize this fact,—that the person placed there by the officer was acting by his authority to that extent. If the representations made to him were confined simply to the question where this gun had disappeared to, then I would have admitted it. But he has gone beyond that. He said that the admission, or confession, or whatever it was that he got, was upon the promise that he would grant him immunity from impending mob violence." This language of the court is here assigned as prejudicial error by Taylor. The plaintiff in error cannot be heard now to allege this, as he made no objection and noted no exception to the language of the court at the time.

The theory of the state at the trial was that Taylor shot Woods with a double barreled shot gun procured from one Curtis for the purpose; that Woods' wife, Amanda, and Curtis were unduly intimate; that they had procured Taylor to commit the murder. The evidence shows that Curtis had a double barreled shot gun; that it was delivered to Taylor on April 19, on an order from Curtis; that Taylor borrowed gunpowder and gun caps and loaded the gun with leaden slugs, which he had been seen previously preparing from pistol cartridges; on the night, and at the time of the homicide, Woods' wife and two elder daughters were away from home; during the evening Taylor came into the house, bringing a bottle of whiskey, and requested Woods to drink. Soon after Taylor left, Woods retired leaving a lamp burning in his bedroom, and soon afterward the shot was fired that killed Woods in his bed. The lead slugs found in the body and bed of the murdered man were very similar to the ones Taylor had been seen loading the shot gun with. The gun was not found.

After the evidence of the above facts had gone to the jury, and after the court had excluded the state's offered evidence of the confession made by Taylor to the sheriff, the state recalled the sheriff and examined him as follows:

Q. I believe you said you saw the defendant on the night of the murder of Robert Woods?

A. I did.

Q. Where did you first see him?

A. I saw him at his—where he was living.

Q. Did you have any conversation with him about the gun that night?

A. I did.

Q. What was it?

A. I asked him if he had the gun.

Q. What did he say?

A. He gave me the answer, he said he didn't have.

Q. He said he didn't have?

A. Yes, sir.

Q. Did you make any effort to find the gun?

A. I did.

Q. Supposed to have been used on this occasion?

A. I did; I did make an effort.

Q. What effort did you make and where did you get the information that induced you to make that effort?

A. I took Taylor with me to look for the gun.

Q. Where did you go?

A. I went down on the bottom near where this murder had been committed.

Q. Where did you search?

A. I searched the pond of water.

Q. Who made the search?

A. The defendant made most of the search.

Q. How did you come to go there?

A. The defendant told me he thought he could.

Q. How did the defendant come to go with you, voluntarily or otherwise?

A. Voluntarily.

Q. Now, state what he said about it on this occasion.

A. He told me he thought he could find the gun if I would take him to where he would search for it.

Q. Where did he say he last saw the gun on this occasion?

A. He told me he delivered the gun to Mr. Curtis at Curtis' gate.

Q. When?

A. The evening of the murder—the night of the murder.

Q. Before or after?

A. After.

Q. Was there anything said at that time as to where he last saw the gun, and if so, state what it was?

A. He told me he delivered the gun to Curtis at Curtis' gate the night of the 22d.

Q. Where did he last see it—what if anything was done with it, if he seen it?

A. I asked him what Curtis did with the gun and he said he started east—that is east from his gate.

Q. In what direction was it you made the search?

A. East of there in a pond of water.

Q. How many searches did you make for the gun at that place?

A. I made two searches.

Q. With this defendant?

A. Two searches with him.

Q. How far apart were these two efforts made?

A. I think it was two different days; that is my recollection.

Q. If anything was said at this second search by this defendant to you with reference to this matter that you have not stated, state it now; anything additional in reference to this gun or matter in the second effort to find it.

A. It was simply a repetition of the first conversation.

We did not succeed in finding the gun in the first search, and he said perhaps that he didn't hide it in the pond and that we might find it about the premises—that is, Curtis' premises, and we searched through the lot to an old shed and barn that he had and in his house and through his house and in the house adjoining the lot. He had two houses, one on the next lot, and we searched that.

Q. The defendant was with you helping you make this search?

A. Yes, sir.

Q. Did you ever hear the defendant make any statement in reference to this matter in the presence of Curtis with reference to this gun—what was done with it?

A. He did make a statement.

Q. Tell me what he said.

A. He told him, Curtis, in my presence, that he delivered the gun to him at his gate after he had done the job; that he started out and said to him, "You started east with the gun from your gate."

Q. When was this?

A. To the best of my recollection, it was the evening of the murder; that was the evening of the 22d.

This evidence, condensed, amounts to this: That the sheriff testified that the prisoner told him that he thought he could find the gun if the sheriff would take him to where he, the prisoner, would search for it; that he, the prisoner, had delivered the gun to Curtis at his gate the evening the murder was committed and after its commission; and that the prisoner said to Curtis, in the presence of the sheriff, that he, the prisoner, had delivered the gun to him, Curtis, at his gate after he had done the job (that he started out to do), and the prisoner further said to Curtis at this time, "You started east with the gun from your gate."

The cross-examination of this witness, so far as the same is material, was as follows:

Taylor v. State.

Q. The defendant was under arrest at the time you have been narrating?

A. Yes, sir.

Q. He was in your custody?

A. He was.

Q. You were making all possible efforts and using all possible means to find out where the gun was?

A. I think I was.

Q. You had been telling the defendant had you not— had you not been holding out some hope to the defendant if he would find this gun?

A. I think I had.

Q. Is it not a fact that you had been telling the defendant that if he would tell you all about this, and if he would help you find this gun, his life would be saved?

A. Shall I repeat just what I told him, judge?

By the court: Yes.

A. I told him I thought if he had committed this murder and made a clean breast of it, and if there were others implicated, and if he would tell all about it and all he knew about it, that I did not think he would be hung; that I did not think he would get more than just a sentence to the penitentiary for life.

Q. You told him you would stand by him?

A. Yes, sir; I said I would be his friend and do all I could for him.

Q. Didn't you say you would see he would not be hung?

A. I said I would see his friends and that I did not think he would be hung.

Q. You gave him to understand that he would not be hung?

A. I told him in those words.

Q. After that he volunteered to go with you and help find the gun, didn't he?

A. Yes, sir.

The substance of this cross-examination is that while the sheriff had the prisoner under arrest, he said to him that if he would confess the murder, tell all he knew about it, he did not think the prisoner would be hung, and would not be punished more than by being sent to the penitentiary for life; that he would be his friend and do all he could for him.

At the close of this cross-examination the prisoner's counsel moved the court to exclude from the jury the testimony of the sheriff as detailed above, and the refusal to do so is one of the errors assigned here now.

Was this evidence admissible? It is claimed by the plaintiff in error that this testimony, in effect, was putting in evidence to the jury Taylor's confession that he had committed the murder; but it will be observed that the statements made by Taylor to the sheriff were not confessions that he had committed the murder.

"A confession in criminal law is the voluntary declaration made by the person who has committed the crime, to another, of the agency or participation he had in the same. The word 'confession' is not the mere equivalent of the word 'statement,' or 'declaration.'" (*People v. Strong*, 30 Cal., 151.)

"A confession receivable in evidence, only after proof that it was made voluntarily, is restricted to an acknowledgment of the defendant's guilt; and the word does not apply to a statement, made by the defendant, of facts which tend to establish his guilt." (*People v. Parton*, 49 Cal., 632.)

"Any circumstance tending to establish the prisoner's guilt may be proved, although it was brought to light by an admission of the prisoner, inadmissible of itself as having been obtained by improper influence." (*Walrath v. State*, 8 Neb., 80.)

The admissions and statements made by Taylor to the sheriff, as testified to by him, come squarely within the

doctrine laid down in the cases above cited. They were not confessions of Taylor's guilt, but circumstances which tended to prove his guilt, but were not, for that reason inadmissible. It is true that in the statement made by Taylor to Curtis the prisoner voluntarily admitted the killing of Woods with the gun; but this confession, if it should be called that, was not made to the sheriff. It was not made to any one in authority, nor any one who had any control over the prisoner, so far as this record discloses, and seems to have been made voluntarily. The exceptions must be overruled. The judgment of the district court is

AFFIRMED.

THE other commissioners concur.