STATE OF NEBRASKA V. JAMES FORCE.

FILED MAY 20, 1903.     No. 12,558.

1. **Criminal Law: EVIDENCE: CONFESSIONS.** In a criminal prosecution, only such confessions of the defendant as are shown to have been made voluntarily, without fear of punishment or hope of reward, are admissible in evidence.

2. **Confession Held Inadmissible.** The father of the accused, shortly after the commission of the alleged crime, pointed a shotgun at his head and said: "James, you are my prisoner; I have a right to arrest you; you shall go to Harrison and tell the sheriff, county attorney and coroner's jury all about the killing of H. R., and you will get clear; but if you don't you will get convicted." Accused consented to the demand of his father, and made a confession to the officers named. *Held*, That evidence of such confession was inadmissible.

3. **Further Confessions Inadmissible.** Further confessions by the accused, subsequent to such extorted confession, will be equally inadmissible, if so related in point of surrounding circumstances and proximity of time as to raise a presumption that the influences resulting in the first confession have not ceased to operate upon his mind.

4. **Evidence: CONFESSION HELD ADMISSIBLE.** Evidence examined, and *held*, that certain subsequent confessions were surrounded by such

circumstances, and removed from the influences leading to the first confession by such a lapse of time, as to raise a presumption that they were voluntary, and therefore admissible against accused.

ERROR to the district court for Sioux county: JAMES J. HARRINGTON, DISTRICT JUDGE. Exceptions to the rulings of the trial court, on the admission of evidence, under section 483 of the criminal code. *Exceptions sustained.*

*M. J. O'Connell, Albert W. Crites* and *W. H. Fanning,* for the state.

*Francis G. Hamer, contra.*

KIRKPATRICK, C.

This is an error proceeding prosecuted by the county attorney of Sioux county under the provisions of sections 515, 516, 517 of the criminal code, from a judgment of the district court for that county, directing the acquittal of James Force, charged with the murder of one Harvey Russell on June 16, 1901. The trial was had on December 5, 1901. Very little material or competent evidence was offered and received by the trial court, and, upon the evidence received, the jury would hardly have been justified in finding the defendant guilty. The peremptory instruction of the trial court was therefore right; and the only question requiring consideration is: Whether the trial court erred in excluding certain evidence offered by the prosecution, tending to establish the guilt of the accused. This evidence relates to alleged confessions and statements made by defendant, which it was contended, on the part of the defense, were not voluntarily made, and were therefore inadmissible.

It is disclosed that Harvey Russell was found dead on June 16, 1901, having been shot with a rifle once through the head, and once through the body, and having also sustained a slight flesh wound in the abdomen. Either of the first mentioned wounds would necessarily have proved

fatal. It is disclosed that James Force came to his home, the residence of his father and mother, some time in the forenoon of June 16, his parents both being in the house at that time. A younger brother of the defendant, as well as a hired hand, seem to have been outside caring for the horses. It seems that defendant made some statement to his mother, who thereupon said to her husband, Franklin Force, "James has shot Harvey Russell." While testimony regarding these facts was being received, the jury were excused from the court room, and the mother, whose name for some unknown reason was not indorsed upon the information, was called as a witness by the defense, for the purpose of showing that the alleged confession which was about to be offered was not voluntary; and what transpired at the trial may best be shown by her testimony as follows:

Q. You remember June 16, about 10 o'clock in the forenoon?

A. Yes, sir.

Q. Were you in your kitchen about that time?

A. Yes, sir.

Q. Who was there with you?

A. James.

Q. Your son?

A. Yes, sir.

Q. Where was his father, Franklin Force, at that time?

A. In an adjoining room.

Q. Did anybody go into the room where Mr. Force was?

A. I stepped to the door.

Q. What did you say to Franklin Force?

A. I said, "James has shot Harvey Russell."

Q. What did Mr. Force then do?

A. He came out.

Q. Where was Frank Houston at that time?

A. Well, he went out and ordered Frank to get the team.

Q. Did Frank go and get the team?

A. Yes, sir.

Q. Then what did Mr. Force say to James?

State v. Force.

A. He said, "James, you will have to go to Harrison and tell the sheriff, county attorney and coroner's jury all about the killing of Harvey Russell; if you do you may get clear, and if you don't you may be convicted."

Q. State anything more he said there that you remember.

A. James said, "I don't want to go, Pa, till I have an attorney."

Q. Did he mention any attorney that he wanted to get?

A. Attorney Harrington.

Q. What did he say about that, what did James say, if anything, further?

A. He said he wanted attorney Harrington.

Q. Before he said or did anything?

A. Yes, sir, before he said or did anything.   *   *   *

Q. Now, then, what did his father say when his son said that he did not want to tell anything or do anything until he got his attorney?

A. He stepped aside to a room and picked up a shotgun and said, "James, you are my prisoner; I have a right to arrest you; you shall go to Harrison and tell the sheriff, county attorney and coroner's jury all about the killing of Harvey Russell and you will get clear, but if you don't you will be convicted."

Q. What did James say?

A. He said, "Well, Pa, I will go then."

The father, the mother and the defendant, who was then about twenty years of age, got into the wagon and went to Harrison, where the defendant gave himself up to the sheriff; and the sheriff, acting as coroner, summoned a jury, and with the defendant, the county attorney, and members of the coroner's jury, repaired to the place where the homicide was committed. The father and one or two other persons were also present at the place where the body was found. After examining the body and the surrounding ground, the jury were sworn, as also was the defendant, who thereupon told his story to the jury, which was taken down in writing by one of the members thereof. The prosecution sought to show the statements made by

the defendant on this occasion at the scene of the homicide, as to the manner in which the difficulty arose, and the killing occurred. This was objected to by the defense, on the ground that defendant had been coerced by his father to make the confession, and that he had been under restraint and duress; and also that the statement of his father to him that he would be acquitted if he told the whole story was such an inducement as rendered the whole confession incompetent. It was shown that no threats were made against him by any of the persons present at this meeting, and that no promise or hope of reward was held out other than that coming from his father, as disclosed in the testimony of the mother already quoted.

"The rule is well settled that a promise of benefit or favor, or a threat or intimation of disfavor connected with the subject of the charge, held out by a person having authority in the matter, will be sufficient to exclude a confession made in consequence of such inducement, either of hope or fear." *Heldt v. State,* 20 Neb. 492; *Furst v. State,* 31 Neb. 403.

Measured by this rule, we are satisfied that the testimony of defendant given at the coroner's inquest, and the statements and explanations made by him, at that time, to the members of the coroner's jury, the sheriff and county attorney, were not voluntary statements within the meaning of the rule. If the trial court believed the testimony of Mrs. Force, given regarding the transaction, which we assume it did, then the confessions and statements were not such as were properly admissible against the accused. It is quite clear that had the defendant been left to his own volition, he would not have gone to Harrison and delivered himself up to the sheriff; at least, not until he had counsel; and it is equally clear that he would not have given his testimony before the coroner's jury. While the father was not, probably, strictly a person in authority, within the rule recognized in most of the cases, yet, it should be remarked that the defendant was a minor residing at the home of his parents, his father exercising parental author-

ity over him, for which reason we think the case comes reasonably within the rule. It follows, therefore, that the ruling of the trial court in excluding the evidence regarding the confessions of defendant under these circumstances, and his statements made to the officers and members of the coroner's jury, is correct and should be sustained.

It appears that the names of the mother, the younger brother of defendant and Frank Houston, all of whom doubtless heard the conversation, were not indorsed on the information, the reason of the failure of the prosecution so to indorse these names not appearing anywhere in the record. The testimony of these witnesses would manifestly have been material. It is further disclosed that from the time of the homicide until the trial, almost six months, the defendant was in the custody of one Ernest Lyons, who was acting as jailor and who had also been a member of the coroner's jury. It seems that some time during the six months intervening between the homicide and the trial, the defendant, who took his meals with the jailer at the latter's residence, made certain statements to the jailer, and the prosecution sought to show these statements, by calling him as a witness. His testimony was objected to on the ground that he had been a member of the coroner's jury, had heard the involuntary statements and confessions of defendant, wherefore the defendant would as a matter of course tell the same story that he had previously told, the duress of the father which had extorted the first confession still existing. Lyons testified as follows:

Q. How long have you known him (meaning the defendant)?

A. I saw him first on the 16th day of June.

Q. Have you known him since then?

A. Yes, sir.

Q. I will ask you whether since that time, during the whole or any part of the period, he has boarded at your house?

A. Yes, sir.

Q. Did you since that time, and while he was boarding

there, have any conversation with him in reference to the killing of Harvey Russell, of which he stands charged?

A. Not, but very little.

Q. Did he make any statement to you at any time since as to the manner of the killing of the deceased, Harvey Russell?

To this objection was interposed, and upon cross-examination, it was shown that this witness had been a member of the coroner's jury, and had been acting as jailer, having the defendant in charge.

Among other interrogatories put to this witness, were the following:

Q. Did you make any promise of immunity or advantage, or any threats of what would be done, to induce him to make such statement?

A. I did not.

Q. Now, you may go on and state what he said to you, where it was and when it was, in relation to the killing of Harvey Russell.

Objection was interposed to this question in the following words:

"The defendant objects as incompetent, irrelevant and immaterial; and because the witness was one of the coroner's jury; and furthermore, that the defendant was at this time in the custody of the sheriff through his jailer, and any statement made to him is the same, in law, as if made to the sheriff, and that said statements were not voluntary." This objection was sustained.

The prosecution thereupon made the following offer:

"The state offers to prove by this witness, that at the residence of the witness, while the accused was in the presence of the witness and his wife, the accused said, among other things, that he met Harvey Russell out there on that day; that they had some words together; that the accused pulled up his gun and fired three shots at the deceased by which he came to his death; the last of which shots was fired as he lay at or near the bottom of a ravine already testified to by other witnesses, and after having

been dragged by his horse by the stirrup some thirty feet or more. These are a part of the things which we have to prove by this witness, by his answer to this question and other succeeding questions."

The same objection was interposed to this offer as quoted above, and in addition, "that the statements, if so made, were made under the threats and promises and inducements heretofore held out and not withdrawn."

The objection to the offer was sustained and the offer denied. It appears that about a week before the trial counsel for the defendant asked to have the sheriff take the defendant and go out with them to the scene of the homicide. As court was not in session at the time, and it being impossible to get an order from the court for the purpose indicated, counsel for defendant notified the county attorney of his desire, and the latter assented thereto, but said that he would go along with them. Accordingly, two of the counsel for defendant, the county attorney, the sheriff, the jailer, and one or more members of the coroner's jury who seem to have gone with the party as drivers of the teams, went out to the scene of the homicide, went over the ground, made measurements, etc., and there the defendant seems, in answer to questions of his counsel and other members of the party, to have made certain statements regarding the way the killing occurred.

Goodson Lacey was called by the state, and interrogated as follows:

Q. You may state all that was said and done on that occasion last Friday, between the parties who were there present, including the defendant, his counsel, M. F. Harrington and Grant Guthrie, the sheriff, county attorney, Mr. Patterson, Mr. Elmer Smith and yourself.

This question was objected to by the defense for four reasons, in substance as follows: (1) That anything the defendant said or did was in the presence of the sheriff, two members of the coroner's jury and the county attorney, and would naturally be repetitions of the alleged confession; (2) that under the testimony of the county attor-

ney any statement made or act performed, was to be heard by him or performed in his presence, or in the presence of the sheriff, both of whom had heard the alleged confessions; (3) that any statement made by counsel for defendant can not be binding upon the defendant or prejudicial to him; (4) that the matters sought to be introduced are incompetent, irrelevant, immaterial and prejudicial to defendant.

This objection was sustained, and the prosecution then made an offer as follows:

"The state here offers to prove by this witness now on the stand, and by this question and other succeeding questions, the following facts, being the same that we offered to prove by the witness Lowry, which are as follows: That one week ago tomorrow this witness went out to view the scene of the homicide at the request of counsel for defendant, that defendant went along in the custody of one Patterson; that M. F. Harrington, the counsel for the accused, went along; that Grant Guthrie, another counsel for the accused, went along; that defendant's father was absent; that the sheriff, county attorney, Elmer Smith and Patterson, were there together; that M. F. Harrington asked this witness to ask defendant if he saw Harvey Russell have a gun on that day, referring to the day and occasion of the homicide, to which the defendant in the presence and hearing of all the parties said that he did not; that said Harrington in the presence of these persons asked him the further question, whether he saw anything drop, to which the defendant replied in the presence and hearing of all these parties that he believed he did; that the defendant pointed out voluntarily the place where the shells already produced in evidence were found; and that then he moved about the place pointed out and said, 'I might have stood about here;' that some one of the parties then, in the presence and hearing of all, asked how far the gun would throw empty shells, referring to the gun used by the defendant on the occasion of the homicide, and that O. W. Patterson, in whose custody the defendant then

was, said that the gun is here; that the defendant then went up to the wagon, got out the gun, and brought it down and handed it to M. J. O'Connell, who went down into a canyon, and who discharged a loaded cartridge which was then in the gun, brought the gun back and handed it to the accused, who stood on a bank near the place where the shells were found, above the place where he said he might have stood on the occasion of the homicide; that he then ejected the shells once for the purpose of ascertaining how far the gun would throw an empty shell, and then handed the gun back to the county attorney, who himself ejected the empty shell at least twice for the purpose of ascertaining how far it would throw an empty shell; all of which was done as stated for the purpose of determining where the accused stood when he fired the fatal shot, or the two fatal shots; that everything that was there said and done, was said and done without any promise, threat, inducement, promise of reward or advantage of any kind whatever by this witness or the county attorney, or by any other person in authority except his own counsel as above stated."

To this offer counsel for defendant interposed an objection substantially the same as that above quoted, which was sustained and the offer denied. Some other testimony was offered by the prosecution from other persons who were present and heard the same conversation, all of which was ruled out on objection.

The theory of the trial court seems to have been that the first statement made by the defendant before the coroner's jury, was incompetent, because made under a threat and promise made and held out by the father of the accused; that the statement made by accused to the jailer in the home of the latter, and the statements and actions of the defendant about a week before the trial as already mentioned, were all incompetent, to the same extent; upon the presumption that if the defendant made an involuntary confession before the coroner's jury, any conversation which he had or statements by him made at any other time,

when any member of the coroner's jury or any person who heard the first confession was present, would undoubtedly be a repetition of the first confession, and therefore tainted with the same infirmities. In this we are of opinion that the trial court was in error. It is shown that nearly six months had elapsed since defendant had made the alleged confession before the coroner's jury, before he made the statements and pointed out the situation at the scene of the homicide, which was a week before the trial. Although the exact length of time between the coroner's inquest and his alleged statements to the jailer is not disclosed by the record, we are of opinion that the evidence offered by the state as to each of these occasions was admissible. The only theory upon which the evidence given at the coroner's inquest could be excluded was that defendant had been coerced or induced by his father to make the statements, and that he had been called upon by the county attorney or coroner's jury to testify, and had done so, perhaps, without being cautioned as to his rights in the premises. The time, however, elapsing between the confession to the coroner's jury and the statements to the jailer, and the visit to the scene of the homicide is so great as to raise a presumption that he was no longer under the influence of the coercion exercised or inducements held out by his father resulting in the first confession. The authorities draw a clear distinction between confessions of guilt, which are only admitted when made voluntarily, and statements as to facts and circumstances which might tend to establish the guilt of the defendant. *Taylor v. State,* 37 Neb. 788; *People v. Strong,* 30 Cal. 151; *People v. Parton,* 49 Cal. 632.

But whether the statements made by the defendant to the jailer and his statements and actions later at the scene of the homicide are regarded as confessions or not, they were clearly admissible in evidence. The rule seems to be well settled and practically recognized by all the authorities that where the confession offered in evidence was made at a sufficient length of time after the involuntary

confession, to raise a presumption that it was in no way influenced by the involuntary confession, then it is admissible in evidence. *Taylor v. State,* 37 Neb. 788; *State v. Fisher,* 6 Jones, Law (N. C.) 478; *Reeves v. State,* 24 S. W. (Tex.) 518; *State v. Howard,* 17 N. H. 171; *State v. Henry,* 65 Tenn. 539.

From what has been said it follows that the trial court erred in excluding the evidence offered by the prosecution, regarding the statements made by the defendant at the scene of the homicide shortly before the trial, as well as to the statements to the jailer while in custody. The exceptions by the prosecution are well taken, and it is recommended that they be sustained.

HASTINGS, C., concurs.

By the Court: For the reasons stated in the foregoing opinion, the exceptions taken by the prosecution in this case to the rulings of the trial court excluding certain evidence are sustained.

EXCEPTIONS SUSTAINED.