Jones v. State.

---

JOHN JONES, ALIAS WILLIAM STANSER, v. STATE OF NEBRASKA.

FILED OCTOBER 30, 1914.   No. 18,638.

1. **Criminal Law**: CONFESSIONS: ADMISSIBILITY. In a criminal trial a confession of guilt alleged to have been made by the defendant is not competent in evidence, unless first shown to have been voluntarily made.

2. ———: INVOLUNTARY CONFESSION: ADMISSIBILITY. An involuntary statement or confession is not competent against the defendant for any purpose.

3. ———: ORDER OF PROOF: ADMISSIONS. Evidence that defendant has admited guilt or important facts should not be received for im-

peachment or rebuttal, but should, if material and competent, be offered in chief.

4. **Witnesses:** Cross-Examination: Impeachment. A defendant cannot be cross-examined, and afterwards contradicted in respect to matters that are not admissible as part of the case.

5. ———: ———: Involuntary Confession. If the defendant has signed an involuntary written confession, it is erroneous to allow him to be cross-examined, for the purpose of impeachment as to the contents of that confession.

6. *Taylor v. State,* 37 Neb. 788, disapproved.

Error to the district court for Douglas county: James P. English, Judge. *Reversed.*

*Carroll H. Wright, Will N. Johnson* and *John A. Mc-Kenzie,* for plaintiff in error.

*Grant G. Martin, Attorney General,* and *Frank E. Edgerton, contra.*

Sedgwick, J.

The defendant, who is the plaintiff in error here, was found guilty of murder in the first degree in the district court for Douglas county, and his sentence was death. The case appears to have been carefully tried, but there are two serious questions presented by the record.

1. The evidence shows that, when the defendant was arrested for the crime, he was taken to the county jail and there in the presence of three officers he signed a written confession or statement. After the defendant had testified in his own behalf, he was questioned by the attorney for the state in regard to statements he was supposed to have made at that time to these officers, which statements were supposed to be inconsistent with his testimony in his own behalf, and, having denied that he made such statements, the officers were examined in rebuttal, and testified to certain admissions or statements made to them by the defendant. There was no proof that the alleged statements were voluntary on the part of the defendant. Counsel for the defendant insist that this amounted to proof of an alleged confession by the defendant while he was in cus-

tody on the charge of murder in the first degree, and that to receive such evidence was erroneous and prejudicial. It is contended by the state that the evidence tended only to prove an admission of a material fact inconsistent with the evidence of the defendant, and that, the proper foundation for impeaching testimony having been laid, the evidence of the officers was competent. The evidence that had been offered by the state in chief tended to prove that the defendant shot and killed the deceased in the pool hall, which was kept by the deceased, that the defendant had been playing a game of pool with certain parties, and that after the game a dispute arose between the defendant and the deceased in regard to paying for the game, and after a few words had passed between them the defendant left the hall, and in a few minutes thereafter returned, and, standing in the door by which he entered, asked the deceased to return the money which he had paid, and, being refused, he immediately shot and killed the deceased. The defendant admitted that he shot and killed the deceased, but insisted that it was during a quarrel and was in self-defense. After the defendant had testified to circumstances tending to support the defense, the following appears in the record:

"Q. Now, Mr. Jones, do you remember after you were arrested and brought back to the city of Omaha and taken to the city jail that you had a conversation in the presence of Stephen Maloney, W. T. Devereese, and Thomas Ring, with reference to this shooting? A. Conversation, no, I didn't have a conversation. Q. You had a talk with them? A. No, sir. Q. You had no talk with them at all? A. No, sir. Q. Do you remember signing anything at that time? A. Yes, sir. Q. In the presence of Steve Maloney, Thomas Ring and W. T. Devereese? A. Yes, sir. Q. And was that statement in your handwriting? A. No, sir. Q. It was read over to you, was it not? A. Yes, sir. Q. Do you remember stating to the officers at that time—

"Mr. McKenzie (defendant's attorney): I object to that as immaterial, irrelevant, and incompetent, and not the

proper way to examine a witness in reference to the contents of a statement he has signed.

"The Court: The form of your question is not proper. If you are laying foundation for impeachment you ought to ask him if he did not make a certain statement. To which ruling the state excepts.

"Q. Did you not at that time make this statement, with reference to the manner in which the shooting occurred at the pool hall at 1004 Capitol Avenue on the night of the 18th of October, 1913, did you not make this statement with reference to that: 'I stepped outside the door and asked again for my money, and he would not give it to me, and I went down to my room, 922 Capitol Avenue, and got my pistol from Mrs. Callia, and came back to Sam's pool hall; then I asked him for my hat and money, and he gave me my hat, but kept the money, and told me to go out as quick as I could.' Did you make that statement?

"Mr. McKenzie: I object to that as immaterial and irrelevant and incompetent, and not the proper way to examine a witness with reference to a statement which he is presumed to have made. Objection overruled. The defendant excepts.

"Q. Did you make that statement on December 11, 1913?

"The Court: I do not understand you are calling for the contents of a written instrument now, are you?

"Mr. Piatti (prosecuting attorney): Yes; he made that statement, and it was placed in writing and he signed it afterwards.

"The Court: I do not think that is right.

"Mr. Piatti: I am asking first if he made the statement to the officer.

"The Court: That is a different thing.

"A. No, sir.

"The Court: With the understanding you are not calling for the contents of a written document, but simply for a part of a conversation that occurred, I will permit the witness to answer.

"Mr. McKenzie: I understand counsel is reading from a statement.

"Mr. Piatti: That is simply to refresh my memory with reference to the statement.

"The Court: He can formulate the question to suit himself. The defendant excepts.

"Q. Did you make that statement in the presence of these officers on that date? A. No, sir. Q. In the city jail, city of Omaha? A. No, sir.

"The Court: Let us see what the state of the record is. (Record read by reporter.)

"The Court: If you are going to follow this up by way of impeachment, they would be entitled to that statement on the examination of the officers."

The most important question of the case was as to the grade of the guilt. If the crime was done with deliberation and premeditation as well as malice, it would be murder in the first degree and would justify the extreme penalty of death by electrocution. If it was done in the excitement of a quarrel and without premeditation and deliberation, the penalty of death could not be imposed. If, after the dispute between the defendant and deceased, the defendant left the hall to procure a revolver, and, after having procured it, returned and without further controversy killed the deceased, the fact of deliberation and premeditation would be established. The question, therefore, propounded to the defendant was in regard to an alleged admission that the crime was murder in the first degree. These officers, while the defendant was in their custody and in the jail, had caused this admission to be reduced to writing and had induced the defendant to sign the same. This writing, it is conceded by all, was a confession of guilt, and, holding this confession in his hand to refresh his memory, as he stated, the prosecuting attorney repeated to the defendant a part of the substance thereof and asked him if he made such statement in the presence of these officers. There was no evidence that this was a voluntary confession. Indeed, it would be difficult to establish it as such under the circumstances. If it was

intended to use the statement or confession as evidence against the defendant, it should have been offered as evidence in chief, and a confession cannot be used as evidence, unless it is first shown that it was voluntarily made. If the confession was competent, the writing itself would be the best and only admissible evidence.

"The reason for the rule excluding involuntary confession is not based on the thought the truth thus obtained would not be acceptable, but because confessions thus obtained are unreliable. The rule is in the interest of safe and reliable evidence. * * * The essence of the rule is that when the confessions are made the conditions as to hope or fear are such as to make them unsafe as evidence." *State v. Novak,* 109 Ia. 717, 729.

Mr. Wigmore says: "The ground of distrust of confessions made in certain situations is, in a rough and indefinite way, experience. There has been no careful collection of statistics of untrue confessions, nor has any great number of instances been even loosely reported; but enough have been verified to fortify the conclusion, based on ordinary observation of human conduct, that under certain stresses a person may falsely acknowledge guilt. This possibility arises wherever the innocent person is placed in such a situation that the untrue acknowledgment of guilt is at the time the more promising of two alternatives between which he is obliged to choose; that is, he chooses any risk that may be in falsely acknowledging guilt, in preference to some worse alternative associated with silence." 1 Wigmore, Evidence, sec. 822.

An involuntary confession of guilt is incompetent for any purpose. The reason of this rule of law is well stated by the supreme court of Wisconsin in these words: "When the defendant was asked if he made that confession, and denied it, the same witnesses who extorted the confession, and whose testimony was disallowed on that account, are allowed to testify to the confession, however wickedly or wrongly it was obtained, on the exceedingly narrow theory that it is not admitted *as a confession,* but merely to *contradict* the witness. The confession is allowed to go to

the jury, and have its effect in convicting the defendants, and override the ruling of the court that it was inadmissible as evidence against him, and for such a petty reason. The confession is just as objectionable as evidence, and as incompetent and hurtful, when offered in one way as in another. If no other evidence on the ground of contradicting the defendant as a witness could be found, he had better have gone uncontradicted than that his legal rights as a prisoner should be so violated and his conviction obtained by such unlawful testimony. The object is to get the confession in evidence. It cannot be done *directly,* but it can be done *indirectly.* It cannot be used to convict, but it can be used to *contradict,* the defendant, and in that way it is used to convict him all the same. We cannot adopt such a principle or practice in the administration of criminal law. It is unreasonable as well as unjust. This evidence was inadmissible on the familiar ground that a witness cannot be cross-examined and contradicted in respect to matters not admissible in evidence as part of the case. Wharton, Criminal Evidence (10th ed.) sec. 484. That confession first went to the jury and produced its effect as evidence, before it was excluded by the court, and finally goes to the jury as competent evidence by way of contradicting the defendant. It seemed impossible to keep it out, however objectionable or incompetent it was as evidence against the accused." *Shephard v. State,* 88 Wis. 185.

The brief of the attorney general admits that a confession of guilt not shown to be voluntary is inadmissible in evidence, but contends that the statement proved was not a confession of guilt, but merely the admission of an important fact which tended, in connection with other evidence, to show the guilt of the accused. This contention is well answered in the brief of the defendant's attorney as follows: "The state admits that a confession was made, but seems to distinguish between the oral and written expression of it. There appears this statement in the brief of the state: 'He went further, as is shown by the cross-examination of the officers who wrote out a complete con-

fession of the crime; this confession was not introduced in evidence because it was not necessary in establishing the man's guilt.' If the writing was a confession, then surely the preliminary statement that was incorporated in that writing was also a confession. If any part of it was a. confession, then the whole story would be, and it would all receive the same taint and all be subject to the same strict rules of proof. The mental attitude of the accused is the same throughout the entire story, whether the story is given. orally or in writing, and all the statements are equally untrustworthy. Counsel for the state at the trial below seemed to have a similar attitude. They considered that this statement was part of a confession to the police officers and refrained from putting any part of this statement in evidence as direct testimony. They were acting under an erroneous assumption that a confession could be used indirectly for purposes of impeachment without any preliminary proof of its voluntary character."

In *Walrath v. State*, 8 Neb. 80, the law is said to be: "Any circumstance tending to establish the prisoner's guilt may be *proved*, although it was brought to light by an admission of the prisoner, inadmissible, *per se*, as having been obtained by improper influence."

This case is cited in *Taylor v. State*, 37 Neb. 788, as tending to justify the conclusion reached in the latter case, but, of course, this statement of the law had nothing to do with the proof of admissions or confessions as such, but only as to the proof of facts that may have been discovered because of such admissions, and that are capable of being proved by other and competent evidence. In *Taylor v. State, supra,* the sheriff testified that, while he had the defendant in custody, he told the defendant: "I thought if he had committed this murder and made a clean breast of it, and if there were others implicated, and if he would tell all about it and all he knew about it, that I did not think he would be hung." He then testified, among other things that the defendant said and did, that he, the defendant, "told him, Curtis, in my presence, that he delivered the gun to him at his gate after he had done the job;

that he started out and said to him, 'You started east with the gun from your gate.' " The words "had done the job" plainly related to the commission of the murder, and the court, in the opinion by Mr. Commissioner RAGAN, which seems to have been concurred in by the other commissioners of the court, said: "It is true that in the statement made by Taylor to Curtis the prisoner voluntarily admitted the killing of Woods with the gun; but this confession, if it should be called that, was not made to the sheriff." After the defendant had made several statements tending to implicate himself in the crime, which statements were made pursuant to the proposal of the sheriff to protect him against the death penalty, he, the defendant, while explaining facts to the sheriff which would show how the crime was committed, made the statement to Mr. Curtis, in the presence of the sheriff, which was plainly a confession that the defendant had committed the crime. If it was intended to decide that this evidence was competent because the statement was addressed to Curtis, instead of being addressed to the sheriff, we cannot approve of the decision nor follow it as a precedent.

In *McLain v. State,* 18 Neb. 154, the defendant was charged with larceny, and, when arrested, a part of the stolen property was found on his person. It appears from the opinion that the evidence objected to as proof of the confession was simply that the defendant gave the officers some information by means of which they found one of the stolen articles. The defendant had pawned a watch in Chicago, and, without telling the officers who had placed it there, he gave the officers "the name of the shop where it might be found." Of course, it was rightly held that the proof of this fact was not proof of a confession of guilt.

In *Burnett v. State,* 86 Neb. 11, it was held that certain statements made by the defendant did not amount to either confessions nor admissions of guilt, and it was held that they were improperly treated by the court in its instructions as admissions of guilt. The opinion, perhaps, does not make the distinction between "inculpatory statements"

and a confession or admission of guilt very clear and definite, but it is manifest that the statements of the defendant which were proved related only to facts which were not important of themselves but might help explain other circumstances involved in the case.

In the case at bar the prosecuting attorney held the written confession in his hand and read therefrom to the witness a very important part thereof, and asked the witness, "Did you make that statement?" When this was objected to, the court asked the prosecutor if he was "calling for the contents of a written instrument," and the prosecutor answered, "Yes; he made that statement, and it was placed in writing and he signed it afterwards." The court said that was not right, but said, "With the understanding you are not calling for the contents of a written document, but simply for a part of a conversation that occurred, I will permit the witness to answer." The defendant's counsel suggested that the prosecutor was "reading from a statement." The prosecutor admitted that he was, but said it was only to refresh his memory, and the court decided that "he can formulate the questions to suit himself." Counsel considered, and the court seems to have also, that the prosecutor could use any part of the confession he saw fit for impeaching the defendant as a witness, although the confession itself was incompetent as evidence. In this the court was clearly wrong. The evidence, aside from that erroneously admitted, is sufficient to sustain the conviction. In a case where the jury is not vested with the power to decide whether the punishment shall be death or life imprisonment, we would consider that the error was not prejudicial, but where it is impossible to determine the effect which this had in causing the jury to decide upon the extreme penalty of the law, rather than the lighter punishment, such an error must be rejected as prejudicial. Reversals for mere mistakes in trials which do not affect substantial rights are not favored, but where the balance sways between life and death every such right of the accused must be protected.

Jones v. State.

2. The court instructed the jury: "Malice is that state or condition of mind indicated by a wicked and malicious purpose which characterizes the perpetration of a wrongful act intentionally committed, and without lawful excuse or justification. It is that quality or frame of mind which prompts the unlawful act. This frame or condition of mind is denominated express or actual malice, and its existence, if it does exist, is to be inferred or found by the jury as any other material element in the case,— beyond a reasonable doubt." In reading this instruction the punctuation suggests that the words "beyond a reasonable doubt" limit "inferred" as well as "found by the jury," so that the two expressions are equal, and "inferred" is merely iteration, that is, has no real force or meaning in the sentence. If the comma were placed after the word inferred, and the subsequent comma and dash omitted, it might be understood to mean that malice could either be inferred or found as a fact by the jury, and that in the latter case it must be proved beyond a reasonable doubt. It is dangerous to give the jury instructions, the meaning of which may depend upon the position of a comma. When the instruction is read to the jury they might be given a wrong impression by emphasis and pause at the word inferred. As that word is capable of a wrong construction and meaning as used in this sentence, and adds nothing to the meaning if rightly understood, its use in this instruction was erroneous. As the judgment must be reversed for the reasons first discussed, it is not necessary to consider whether, in the light of the whole evidence, and the other instructions given, the error in this instruction was without prejudice to the defendant.

The judgment of the district court is reversed and the cause remanded.

REVERSED.

BARNES and FAWCETT, JJ., dissent.

ROSE, J., not sitting.