**UNITED STATES of America**

v.

**Thomas W. ROBINSON, Appellant.**

**No. 22899.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 16, 1970.

Decided Dec. 30, 1970.

Petition for Rehearing Denied March 1, 1971.

McGowan, Circuit Judge, dissented and filed opinion.

Mr. David Cobb, Washington, D. C. (appointed by this Court), for appellant.

Mr. Julius A. Johnson, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before FAHY, Senior Circuit Judge, and WRIGHT and McGOWAN, Circuit Judges.

FAHY, Senior Circuit Judge:

Appellant was tried for first degree murder in violation of D.C.Code § 22–2401. He was convicted of murder in the second degree and sentenced to imprisonment for a term of fifteen years to not more than life. The court recommended that he receive psychiatric treatment.

## I

The homicide occurred when appellant was a patient at St. Elizabeths Hospital, to which he had been committed on March 25, 1965 as a result of a verdict of not guilty by reason of insanity at his trial for a rape charged to have occurred in August, 1964. When admitted to St. Elizabeths in November, 1964, for observation prior to that trial, he had been diagnosed by the staff as a "patient * * * suffering from a schizophrenic reaction, chronic undifferentiated type," but he was deemed competent to stand trial. Upon readmission to the hospital after the trial, he was confined to John Howard Pavilion, the maximum security ward. Eight months later his diagnosis was changed to "emotionally unstable personality." Under the controlled conditions of John Howard Pavilion the hospital staff believed he had improved, and in February, 1967, he was transferred to Cruvant Service at the hospital, where he progressively was given greater freedom, including ground privileges.

A brutal killing of a female employee of the hospital occurred in a wooded area near the hospital the morning of May 30, 1967. Appellant was convicted of this crime and now appeals. The principal evidence against him was a confession. Though there were several confessions, only the final one was offered and admitted in evidence. This occurred after a hearing on defense counsel's pre-trial motion to suppress the confessions. We think the admission of the confession was error, and for that reason we reverse.

Officer Preston was the first witness at the suppression hearing. He testified that, accompanied by two other officers, he interviewed appellant about the homicide twice on June 5, 1967, because appellant had been committed to the hospital as a patient as the result of a rape

case closely paralleling the case under investigation. Officer Preston testified that he advised appellant at the first interview of its purpose. Appellant initially denied any implication in the crime. The officer then asked him what he had done the morning of the crime, and continued his testimony as follows:

> The defendant told me that he had been inside the Cruvant building until approximately 2:30 p.m. on May 30, and that he had not been in the area where the body was found at any time during that morning.

> At this time I told the defendant that I had two witnesses who had seen him on a path that the decedent in the case had taken.

> I did not have two such witnesses at that time. However, the defendant Robinson said to me, "You mean Lightfoot and Long saw me?"

> And I assured him that they had. So he then admitted to me that Yes, he had gone out the path through the— around the fence at Saint Elizabeths and gone through this path sometime between 9:30 and ten a.m. on that morning.

On cross examination the officer explained, "I bluffed him."

During this interview Officer Preston observed what appeared to be fingernail scratches on appellant's arms. The officer testified that he still had no intention of arresting appellant but that he was interested in the scratches; he felt perhaps there had been a series of struggles in the woods and the victim had in some way marked her assailant. To a question whether he advised appellant during this interview of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he responded, "[h]e was not in custody; no, sir." After the interview Officer Preston discovered from speaking with one of the men appellant admitted had seen him that it was indeed possible appellant had been on the path "during what we felt was the critical time."

Later that day the three officers interviewed appellant again for about two hours. At the start of this interview Officer Preston testified that he told appellant:

> You don't have to talk to me, you can get up and walk out at any time, and I don't want to do anything to upset you, but I am very interested in your activities that morning because of what you had done at Fort Dupont a couple of years before.

The officer then testified that appellant agreed to talk and told them about his morning bus ride to his sister's house, where nobody was home, and his later return to the hospital. Appellant also offered an explanation for his scratches, except for the deep scratch at an angle on the upper biceps of his left arm. The major part of the interview was consumed by appellant's discussion of his hostility towards women in general and the details of the earlier rape crime charged to him in 1964, known as the Fort Dupont case.

Attention continued to focus on appellant. After the second interview, Officer Preston examined appellant's shoes and clothes in his locker. The next day, June 6, appellant was returned to the maximum security ward. Finally, according to a memorandum of Dr. Owens, the Clinical Director of this ward, which was introduced in evidence, the police on June 7 took a picture of the scratches on appellant's arm and talked with Dr. Owens at great length about appellant being a suspect. After this meeting of Dr. Owens with the police, again according to the memorandum of Dr. Owens, appellant was brought to Dr. Owens' office for the purpose of "getting the entire matter settled or in any way we could clear him as a suspect." He asked appellant whether he would like a "sodium-amptal (*sic*) interview examination [truth test] * * * to [help] clarify his position in the matter." According to the memorandum, appellant became tense and anxious at this suggestion and said he would like to speak with his fam-

ily and an attorney before taking such a test.

Dr. Elliot R. Blum, the clinical psychologist at the maximum security ward, was also a witness at the suppression hearing. He had known appellant since May, 1966 because of appellant's participation in the doctor's group psychotherapy sessions conducted twice a week. He recalled that around the end of May, 1967, appellant was experiencing extreme agitation from a very distressing relationship in his life.[1] On May 30, 1967, appellant did not keep an appointment, and the doctor felt that this was rather significant since it was the first time appellant had missed the group meetings. The doctor then learned of the crime and appellant's transfer back to John Howard Pavilion as a suspect. When he visited him there appellant said, "they have me in here on (sic) a suspect," but he seemed to treat the matter lightly. Soon thereafter, however, on Saturday, June 10, 1967, Dr. Blum received a telephone call at home and was told that appellant wanted to talk with him about something very important. The doctor met appellant at the hospital "as a therapist and nothing more." Appellant thereupon told the doctor what had happened on the day of the crime. Dr. Blum described appellant as being in a highly emotional state: "he was bawling like a baby;" "[i]t was more of a compelling kind of thing, there, then, that he had to tell me." Crying profusely, appellant asked what he should do. Dr. Blum replied that "the truth, in the final analysis, is the best thing," and he advised appellant to "make a clean breast of it" to Dr. Owens and to Dr. Schwartz, the ward administrator. He thought that appellant felt he had no other recourse than to tell the doctor about the crime.

When asked whether appellant was aware of the consequences of his confession, Dr. Blum answered that appellant was aware that he confessed to murder but he did not realize the judicial process would be leveled against him. It was Dr. Blum's opinion that appellant believed he would remain in the hospital and be treated as he always had been.

Dr. Blum later felt uneasy about the situation and had misgivings about what he had done. Throughout his years of association with appellant, the doctor said he had tried to instill in him a confidence in their relationship and had encouraged him to confide about his personal problems.

> * * * I think he respected my advice and * * * what I would say to him. I think he would go along with it [the doctor's suggestion] and I was relatively naive in terms of what the effect of this kind of situation was.

The doctor added that if he had told appellant to get a lawyer before speaking with Dr. Owens or the police, appellant would have obtained a lawyer. But in response to a question by a superior as to why he did not give this advice, he explained that at the time:

> [T]he thought never occurred to me. I just thought the idea of telling * * * the doctors in charge of his case, because he is a committed patient in the hospital.

Dr. Owens was reached with appellant's consent and a conference was scheduled for the following Monday, June 12, 1967. Dr. Owens testified at the suppression hearing that he had a general idea why the meeting was arranged. Indeed, he called an Assistant United States Attorney for advice and was told that he should advise appellant of his right to an attorney and his right to remain silent. Of the meeting on Monday, attended by Dr. Owens, Dr. Blum, Dr. Schwartz, and appellant, Dr. Owens testified at the suppression hearing that he immediately told appellant of his rights: that he had

---

1. Appellant had met a woman, who, according to Dr. Blum's testimony at trial, was the first person with whom he had prolonged contact. She became pregnant by him and he was elated. The woman's grandmother, however, refused to permit another baby in their house, and an abortion took place. Robinson was told of this on the telephone and became very upset.

a right to an attorney; that if he could not obtain one he "would call one for him" or would ask the District Court to appoint an attorney for him; and that he did not have to say anything. Dr. Owens could not recall advising appellant, however, that anything he said might be used against him or that he could stop talking at any time during the course of the interview. Appellant said that he had something on his mind which he wanted to talk about and would feel better if he discussed it with the doctors.

Dr. Blum gave a significantly different account of what transpired at the interview with Dr. Owens. His testimony was that upon arriving Dr. Owens immediately said, "Well, what is it?" or something like that, and that appellant replied, "I killed that woman." Dr. Blum was certain that nothing was said concerning a lawyer until after the confession had been elicited from appellant.

After appellant had given the details of the homicide, Dr. Owens testified that he asked him, "did he want to—would he like to discuss anything with the police because he knew they were checking on his activities and what he had been doing," and that appellant replied he wanted to talk to them. Dr. Owens said that he told appellant he did not have to talk to the police and he had the right to an attorney, but that appellant responded "he wanted to talk to the police and get it over with."

Dr. Owens then called the police. Detectives Wilson and Mann came to the hospital within a matter of hours the same day. They read to appellant P.D. Form 47, as follows:

> You are under arrest. Before we ask you any questions, you must understand what your rights are. You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions. Anything you say can be used against you in Court. You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning. If you cannot afford a lawyer and want one, a lawyer

will be provided for you. If you want to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

When they finished this procedure, Dr. Owens asked appellant if he understood what had been read to him and if he wished to have an attorney. Appellant said he understood and did not wish an attorney. The doctors then left, and appellant again told his story to the police.

At the conclusion of the hearing on the motion to suppress, the court made its findings as follows: defendant was competent at the time he gave all three confessions; he was aware of his rights, being offered counsel and being sufficiently warned under *Miranda* at the time of the third confession; all three confessions were voluntary and admissible, the last one constituting the third recitation of the facts; and the defendant was anxious to get the statements off his mind.

After these rulings the prosecutor stated that while he considered all three confessions to be legally sound and admissible, he would as a matter of strategy present to the jury only the final confession given the police, because it had the most solid footing—at this point defendant had been completely advised of his rights. He added that he considered the other confessions relevant to the issue of voluntariness of the final confession and that that was why all three were presented to the court at the hearing.

The course thus indicated was the one pursued at trial; only the confession given to the police was related to the jury.

## II

 We postpone consideration of the manner in which the confession was presented to the jury in order to consider first whether any of the confessions should have been admitted. It is the duty of this court "to make an examination of

the record in order to ascertain whether [appellant's] statements were voluntary," considering the "totality of the circumstances." Greenwald v. Wisconsin, 390 U.S. 519, 520–521, 88 S.Ct. 1152, 1153–1154, 20 L.Ed.2d 77 (1968).

 A. Contrary to the assumption of counsel, four implications, rather than three, are involved. The one omitted from consideration was appellant's concession to Officer Preston at the first interview on June 5, 1967.[2] After maintaining that he had remained inside until 2:30 p. m. the day of the crime, appellant conceded his presence at or near the scene of the crime at or near the time of its commission when told by Officer Preston that two witnesses had seen him near the scene. The admissibility of this self-implicating statement is to be judged by the standards of admissibility applicable to a confession:

"The rule excludes not only direct confessions, but any other declaration tending to implicate the prisoner in the crime charged, even though, in terms, it is an accusation of another, or a refusal to confess."

Bram v. United States, 168 U.S. 532, 541, 18 S.Ct. 183, 186, 42 L.Ed. 568 (1897). *See also* Miranda v. Arizona, 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966), where the Court stated: the "privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination." Even if can be said that at the beginning of the first interview conducted by Officer Preston on June 5, 1967, appellant, notwithstanding the suspicious scratches on his arms, was only a suspect on the basis of the similarity of the crime in question with the earlier rape case, when *Officer Preston undertook to bluff him into placing himself on the morning of the crime near its scene, telling him he had been seen, the interrogation had sufficiently focused on appellant to cause the absence of the Miranda warning to bear upon any confession which followed.* Under the reasoning of the *Bram* case the accusation was such as to require an answer, thus rendering the incriminating answer involuntary. *See* 168 U.S. at 562–563, 18 S.Ct. 183.[3] Moreover, appellant was being interro-

2. In the second interview, appellant disclosed to the officers his hostility to women, which the officers must have considered significant to appellant's possible involvement in the crime under investigation.

3. Bram was told by the interrogating official that another person had said he saw Bram commit the homicide. The Court reasoned that the response—that the person referred to could not have seen him from where he was—not only constituted a confession but was compelled self-incrimination.

As our dissenting colleague points out the Court in Bram relied upon all the circumstances in which this incriminating statement was made. The Court established no rule governing cases arising in different circumstances. The principal rationale of the Bram decision, however, was, as we think is true here, that the suspect's statement was involuntary because the statement of the officer that the other suspected person had charged him with crime

produce[d] upon his mind the fear that if he remained silent it would be

considered an admission of guilt, and therefore render certain his being committed for trial as the guilty person and it cannot be conceived that the converse impression would not also have naturally arisen, that by denying there was hope of removing the suspicion from himself. If this must have been the state of mind of one situated as was the prisoner when the confession was made, how in reason can it be said that the answer which he gave and which was required by the situation was wholly voluntary and in no manner influenced by the force of hope or fear? To so conclude would be to deny the necessary relation of cause and effect.

168 U.S. at 562–563, 18 S.Ct. at 194. We rely upon this rationale of the *Bram* decision, in the circumstances of appellant's situation, along with the development of the law governing the admissibility of confessions since *Bram*. We do not distinguish from a legal standpoint the compulsion upon appellant, in the circumstances in which he was being interrogated, from that of Bram.

gated by officers as a suspect in a manner admittedly designed to obtain a confession. The situation of appellant during the interrogation cannot in any rational manner be distinguished from custodial interrogation. We conclude for this additional reason that appellant's statement to Officer Preston cannot validly be used in evidence as a voluntary confession.[4]

**B.** When appellant went to Dr. Blum he was aware of the extent to which the investigation had focused upon him. He had been interviewed twice by the police. They not only had confronted him with the similarity of the crime in question to the earlier one which had led to his confinement in St. Elizabeths, but they had tricked him into implicating himself in the homicide being investigated. Furthermore, scratch marks on his arms, of concern to the police, had been photographed, he had been removed to the maximum security ward because of suspicion of his guilt, and Dr. Owens had questioned him at length about the homicide and had suggested a sodium-amytal truth test, whereupon appellant had indicated his desire for counsel.

Dr. Blum had frequent contact with appellant and had developed with him a relationship of confidence with respect to his personal problems. To quote the doctor, they met as patient and "as a therapist and nothing more." When appellant confessed to Dr. Blum there is no suggestion that he intended to make a confession which would incriminate him with the authorities or that he was aware his course of action would be the cause of his conviction in court.[5] Dr. Blum is quite clear about this, that "[i]t was more of a compelling kind of thing, * * * that he had to tell me." When appellant then asked for the doctor's advice, he was told that a confession to the hospital administrators would be the best thing.

Here, again, if his statements to the doctor were to be used in evidence against him, appellant was entitled, as a minimum, to advice as to his rights, followed by convincing proof of their waiver, such as *Miranda* establishes at least as one of the criteria by which to determine the voluntariness of a confession sought to be used in evidence. Appellant had previously involuntarily implicated himself to Officer Preston, had been twice interviewed by him and two other officers, had been returned to the maximum security ward as a prime suspect, and had been questioned at length by Dr. Owens, who suggested that he take a "sodium-amptal (*sic*) interview examination," to which appellant responded he would like to speak to his family and an attorney. Furthermore, appellant was in custody, without counsel, unadvised as to his right to counsel, and unadvised that what he said could be used against him. While the confession in *Miranda* was elicited during interrogation in police custody, appellant's position was even more conducive to compulsion than Miranda's.[6]

---

4. In Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), governed by the rule before *Miranda*, the Court on the issue of voluntariness expressly relied upon the totality of circumstances, which included the fact that the accused "was a mature individual of normal intelligence." 394 U.S. at 739, 89 S.Ct. at 1425. Furthermore, the Court pointed out that before he made any incriminating statement the accused had received partial warnings of his constitutional rights. *Id.*

5. *See* p. 557 supra. Under D.C.Code § 14-307 dealing with privileged communications between doctor and patient, the general rule of confidentiality is subject to an exception when "the accused is charged with causing the death of, or inflicting injuries upon, a human being, and the disclosure is required in the interests of public justice * * *." § 14-307(b) (1).

6. In Blackburn v. Alabama, 361 U.S. 199, 207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960), the Court stated that the "evidence indisputably establish[ed] the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed" and that "in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while

As the testimony indicates, though he was competent to understand what he was doing, he was a mental patient who was clearly no less subject to Dr. Blum's influence than Miranda was to the influence of the police. And while in a criminal case such as this Section 14–307(b) (1), note 5 *supra*, provides that a disclosure which otherwise would be confidential under the doctor-patient privilege may be permitted in the interests of justice, the rule excluding an involuntary confession is unaffected by this provision of the Code.

We have no criticism of Dr. Blum.[7] We do not say that a duty rested upon him to do other than he did. The issue is quite different. It is whether the confession to him was a voluntary one admissible at appellant's trial. In the totality of the circumstances in which the confession occurred, to avoid involuntariness which rendered it inadmissible, appellant no less than Miranda was in need of such warning and advice as *Miranda* requires, with competent waiver of the rights of which he thus would be advised. There is also the special factor peculiar to this case—the compulsion upon appellant to tell Dr. Blum what he had done, because of the relationship between them and the investigative pressures then exerting their influence upon him. The absence of blame on the part of the doctor, therefore, does not render the confession to him any less inadmissible.[8]

C. When appellant later repeated the confession to Dr. Owens, again no adequate protective warnings or advice as to rights, or waiver of rights, appear. Though Dr. Owens testified that before anything was said at the Monday morning meeting he advised appellant of his right to a lawyer, it is clear nothing was said concerning the use against him in court of anything he might say. In *Miranda* the particular significance of this phase of the warnings was explained as follows:

> This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.

384 U.S. at 469, 86 S.Ct. at 1625, 16 L. Ed.2d 694. Moreover, we are persuaded by Dr. Blum's convincing testimony that Dr. Owens is mistaken in his recollection that the advice as to his right to an attorney was given before appellant first confessed in brief form—"I killed that woman"—to Dr. Owens.

Like that to Dr. Blum appellant's confession to Dr. Owens was inadmissible at his trial. As we have seen, Dr. Blum had advised him that a confession to the

---

insane." *See also* Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957) ; People v. Lambersky, 410 Ill. 451, 102 N.E.2d 326 (1951). Perhaps on this record, though he was still an unreleased mental patient at a mental institution, there is not as strong a probability appellant was insane as that Blackburn was. We point out, on the other hand, that appellant's case on the issue of voluntariness is to be judged by stricter standards, as evidenced by *Miranda*, than prevailed at the time of the *Blackburn, Fikes,* and *Lambersky* cases. Moreover, it is not clear to us that appellant was not suffering from a serious mental illness.

7. Nor do we have criticism of Dr. Owens, the confession to whom is hereinafter considered.

8. The fact that incriminating statements were made to Dr. Blum and Dr. Owens, private individuals, rather than to police officers, does not preclude application of the rule excluding involuntary confessions. *See, e. g.,* Iva Ikuko Toguri D'Aquino v. United States, 192 F.2d 338 (9th Cir. 1951) ; Balding v. State, 77 Okl.Cr. 36, 138 P.2d 132 (1943) ; Palmore v. State, 244 Ala. 227, 12 So. 2d 854 (1943) ; State v. Force, 69 Neb. 162, 95 N.W. 42 (1903) ; Hamilton v. State, 77 Miss. 675, 27 So. 606 (1900).

hospital authorities would be the best thing; and Dr. Blum testified that due to the relationship between the two, appellant would do what the doctor told him to do. The confession to Dr. Owens was but a continuation of what had become compelled self-incrimination by all that had occurred, including the confession to Dr. Blum. The compulsion had not been removed. The confessions to Dr. Blum and to Dr. Owens must be considered together. So considered, and viewed against the background of the earlier events, including the confession to Officer Preston, even though the confessions to the doctors were of a therapeutic value the Fifth Amendment privilege against self-incrimination and appellant's Sixth Amendment right to counsel preclude their use as evidence at his trial for the homicide.

█ D. The warnings and advice given by the police to appellant a few hours later were totally deficient to permit a meaningful exercise of his rights, apart from the absence of convincing proof of their waiver, especially by a mentally disturbed person in appellant's situation.[9] It would be wholly unrealistic to consider the confession to the police as being independent of all that had gone before. It was simply the culmination of the process of disclosure of appellant's complicity, which began with the admissions to Officer Preston and which in all substance was completed by the confession to Dr. Owens. The involuntary nature of the confession to the police was not due to any overt coercive tactics on their part, but rather to the sequence of events which led to this confession, beginning with Officer Preston's initiation of the interrogating process of drawing implicating statements from appellant.

E. We conclude that all of the confessions were inadmissible. In so concluding we have referred to the development of the relevant law as evidenced by the *Miranda* decision, and we have also considered the subsequently enacted provisions of 18 U.S.C. § 3501(b),[10] approved June 19, 1968, and in effect at the time of appellant's trial, which began on January 22, 1969. The provisions of the new statute were neither considered by the trial judge nor have they been relied upon by either party to this appeal. But we do not think this gives us reason to disregard them. Section 3501 (b) provides that "[t]he trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession," including the various circumstances enumerated in the statute. It also provides, however, that the enumerated circumstances "need not be conclusive on the issue of voluntariness." All factors we have considered on the issue of voluntariness clearly come within "the circumstances surrounding the giving of the confession."[11]

9. *See* note 6 *supra.*

10. § 3501(b) provides:
·(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

11. By our consideration in this case of Section 3501(b) and the factors enumerated therein, we do not wish to imply that we would decline in another situation to hold failure to comply with

We emphasize also that the case falls within no well defined pattern due to its unusual factual setting. The need for safeguards to prevent compelled self-incrimination by a person suspected and then accused of crime can be no less because he is a mental patient at a Government institution which has special responsibility for his custody and care. On the contrary, by reason of his patient status appellant was entitled to special regard for his rights by those under whose supervision he was placed. It might well have been their duty to have advised him to obtain counsel rather than only of his right to counsel.

### III

A. In addition to what we have said, we think the confessions to Dr. Blum, Dr. Owens, and Detectives Wilson and Mann must be held inadmissible when we consider the principles embodied in Rule 5 of the Federal Rules of Criminal Procedure, the decision of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L. Ed.2d 1479 (1957), the Criminal Justice Act of 1964, and 18 U.S.C. § 3501(c).[12]

Rule 5(a) requires a person arrested to be taken "without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States." Rule 5(b) provides that the commissioner shall inform the defendant of the complaint against him, of his right to retain counsel, of his right to request the assignment of counsel if he is unable to obtain counsel, of his right to have a preliminary examination, that he is not required to make a statement, and that any statement made by him may be used against him. The commissioner shall also allow the defendant reasonable time and opportunity to consult counsel. The importance of the right to counsel, among those of which the accused is to be advised, was emphatically declared by Congress in the Criminal Justice Act of 1964, 18 U.S.C. § 3006A(b), which provides:

> In every criminal case in which the defendant is charged with a felony or a misdemeanor, other than a petty offense, and appears without counsel, the United States magistrate or the court shall advise the defendant that he has the right to be represented by counsel and that counsel will be appointed to represent him if he is financially unable to obtain counsel. Unless the defendant waives the appointment of counsel, the United States magistrate or the court, if satisfied after appropriate inquiry that the defendant is financially unable to obtain counsel, shall appoint counsel to represent him.

Under *Mallory* a confession made during a period of unnecessary delay in complying with the requirement that the defendant be taken before a magistrate is inadmissible at his trial. This judicial rule of evidence has been deemed essential to effectuation of procedural Rule 5 because of the importance of the Rule in the administration of the criminal law. Moreover, 18 U.S.C. § 3501(c) [13] does not

---

the requirements of *Miranda* as conclusive on the inadmissibility of a confession.

12. Because of their importance to a decision of the case we consider the matters discussed in Part III notwithstanding objection pertinent to these matters was not made at trial.

13. § 3501(c) provides:
(c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Pro-*

nullify this judicial rule of evidence, but only restricts its application in circumstances which are not relevant to the case before us.

■ In a strict sense it may be said that appellant was not arrested or detained as envisaged by Rule 5 and Section 3501(c) before the confessions to Dr. Blum and Dr. Owens [14] and that, therefore, Rule 5, and the Criminal Justice Act provision for counsel, do not apply in appellant's case. In all substance, however, even if not technically arrested, he was as though arrested. Probable cause for his continued confinement existed after the interviews with Officer Preston, aside from his patient status. He was transferred the next day to the maximum security ward. No additional restriction of his freedom occurred when the officers later formally said to him, "You are under arrest." The impact of Rule 5, *Mallory*, and the Criminal Justice Act accordingly are not avoided because of the possible absence of a formal arrest.

■ Moreover, even if the Rule, the *Mallory* decision, and the Criminal Justice Act do not strictly apply as such, the rights they stand for cannot be disregarded in determining the voluntariness of appellant's confessions subsequently to the one to Officer Preston. The latter is inadmissible for the independent reasons we have given. The others, aside from the reasons set forth in Part II, were inadmissible because appellant was entitled to no less safeguard against self-incrimination than is available under Rule 5 and *Mallory* to an arrestee, and under the Criminal Justice Act to a defendant charged with a serious crime who is without counsel.[15]

Finally, just as we have concluded that, as a minimum safeguard, appellant should have been advised of his rights, followed by their intelligent waiver, if the compulsion which existed were to be offset, we also conclude that absence of the safeguards provided by Rule 5 and the Criminal Justice Act also left operative the compulsion which, without those safeguards, caused the confessions to be involuntary. It is difficult to imagine a situation in which the purposes of the Rule and of the Act would have been more fully served by compliance with their provisions. It would have avoided the compulsion inherent in this investigation of an institutionalized mental patient who continued without counsel for eight months after the homicide, and for six months after his indictment.

B. The case also raises a question of due process of law. Appellant was not afforded the rights the law accords those accused of crime in order to protect the integrity of the administration of the criminal process. We do not decide the case, however, on grounds of due process, though the matters we discuss in this opinion suggest the possible availability of that basis for decision.

## IV

Appellant contends that the court did not find the confession to be voluntary beyond a reasonable doubt. It is true

vided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

14. The formal statement "You are under arrest" later made by the detectives is irrelevant to our present consideration of the effect of Rule 5 and the Criminal Justice Act, for the applicability of the

substance of the Rule and the Act depends upon events which preceded the interview with the detectives.

15. In Edmonds v. United States, 106 U.S. App.D.C. 373, 273 F.2d 108 (1959), cert. denied, 362 U.S. 977, 80 S.Ct. 1062, 4 L. Ed.2d 1012 (1960), although we held *Mallory* inapplicable where appellant was already detained when he implicated himself and where no arrest was made, we stated that "the statements were made in a matter of minutes and in response to a single inquiry." *Id.* at 377, 273 F.2d at 112.

that the court did not explicitly so find, but the Government points out that counsel for defendant, just prior to the court's findings, had argued that the accused's statements were not voluntary beyond a reasonable doubt, as required to be admissible by Pea v. United States, 130 U.S.App.D.C. 66, 76, 397 F.2d 627, 637 (1968) (en banc). We note the absence of specific findings in this regard without deciding whether error occurred in this respect or if it did whether it was harmless.

The judge then submitted to the jury the question whether the confession to Detectives Wilson and Mann was voluntary. The jury was not instructed that they must find the confession voluntary beyond a reasonable doubt as a condition to their consideration of it as evidence in the case, as we held to be required in Clifton v. United States, 125 U.S.App.D.C. 257, 371 F.2d 354 (1966), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967).[16] There is a question, however, due to the intervening enactment by Congress of 18 U.S.C. § 3501(a),[17] whether this requirement of *Clifton* applied at the time of appellant's trial. The trial court did not appear to have Section 3501 (a) in mind and, as we have said, it is not referred to by the parties on this appeal. Nevertheless, it raises several questions concerning the responsibility of both the judge and the jury respecting the confession. We do not decide these questions, which it would be necessary for us to do except for the fact that we have held as a matter of law that the confessions are inadmissible and, therefore, cannot be considered by the jury. *See*

Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

V

We are faced also with the possibility that appellant's defense of insanity was prejudiced by the delay in the appointment of counsel. The indictment on which appellant was tried was rendered July 13, 1967, and filed with the court August 17, 1967, but it was not presented to appellant until his arraignment on February 16, 1968, when he pleaded not guilty. During all this intervening time he was in custody at St. Elizabeths without counsel. Counsel was not appointed for him until February 20, 1968, more than eight months after the crime and six months after the return of the indictment. Furthermore, as we have seen, he was never presented to a magistrate under Rule 5, when he would have been advised of his right to counsel and, unless waived, would have been provided with one under Rule 44(a) and the Criminal Justice Act, 18 U.S.C. § 3006A. Nor was local Rule 87(b) of our District Court complied with, which at that time provided that "[o]n the second Friday following indictment the defendant will be arraigned and counsel ascertained." All this is difficult to understand unless due to a decision by the Government, later reconsidered, that appellant need not be tried for the homicide since he was a mentally disturbed inmate of St. Elizabeths, was held there in maximum security, and was not to be released except if it were found under the provisions of D.C.Code § 24–301(e) that he had recovered so that he would not, in the rea-

---

16. This holding of *Clifton* was left intact by *Pea*, which overruled only that portion of the decision in *Clifton* which held that the judge, before admitting a confession, need not find it voluntary beyond a reasonable doubt.

17. § 3501(a) provides:
 (a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is vol-

untarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

sonable future, be dangerous to himself or others.

We are concerned to note that the Superintendent of St. Elizabeths certified to the District Court on August 8, 1968, that appellant was not only competent to stand trial but also qualified for unconditional release; in addition, three hospital doctors and one independent doctor provided appellant by the court testified at trial that at the time of the crime, in May, 1967, appellant had been cured of any mental disease or defect.[18] The Superintendent's opinion resulted, however, from a staff meeting held on June 24, 1968, over fourteen months after the crime. And when one of the doctors who testified at trial was asked whether an earlier diagnosis might have produced a different opinion, he admitted that it might have. Moreover, the examination of the court appointed doctor, occurring in September, 1968, was even more remote from the time of the crime. We do not hesitate to state that upon the record before us, there is substance to the contention that appellant's defense of insanity was prejudiced by the delay in his presentment and arraignment and in the appointment of counsel.[19] In Powell v. Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1932), the Court stated:

> [In] a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble-mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case.

The principle has been repeated recently in United States v. Wade, 388 U.S. 218, 225, 87 S.Ct. 1926, 1931, 18 L.Ed.2d 1149 (1967), holding that "[t]he plain wording of this [Sixth Amendment] guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful 'defence.'"

Nevertheless, some delay in the examination of appellant occurred after counsel was appointed for him. Moreover, his counsel at trial represented that appellant had not been prejudiced by the delay.[20] We accordingly hesitate to conclude that the possible prejudice to which we have referred requires dismissal of the indictment, although we do not pre-

---

18. When one of the doctors who testified at trial was asked why if appellant were considered sane since May, 1967, he had been retained in John Howard Pavilion, the response was:

 [S]imply because there was some question as to his involvement in the death of this woman and therefore he was returned not for any psychiatric reason, basically, but for primarily a custodial reason.

 When the same doctor was asked why appellant had not been examined earlier, the response was:

 We had no occasion, no specific occasion to sit down and make that judgment.

19. The record also casts grave doubt upon the diagnosis of appellant's condition above referred to. That appellant would be dangerous to others if released seems likely in light of his history of involvement in serious crimes against women.

One jury has acquitted him on the ground of insanity, and in the present case after the result of the suppression hearing, he relied principally upon insanity as a defense rather than upon nonparticipation. Additionally, we note his devotion of the major part of the two hours consumed in the second interview with Officer Preston on June 5 to expressions of hostility toward women.

20. When counsel made this representation at trial, it does not appear whether he was making reference to a lack of prejudice in presenting his insanity defense. He stated:

 In other words the factual situation as it existed on May 31, the ramifications of it hadn't changed and after I made a very thorough investigation of this matter and I think I can say that I know as much about the case as the Government knows and knew that from the beginning.

clude the District Court if so advised from passing upon this question after a hearing devoted to the issue of prejudice.

## VI

■ We come to the question whether, in the event of a new trial, appellant is entitled to an instruction that because of his prior acquittal by reason of insanity in 1964, and his continued confinement at the time of the crime, the jury should have been instructed that it should be presumed that his mental disease had continued. The following instruction was given without objection:

> Every man is presumed to be sane, that is, to be without mental disease or defect and to be responsible for his acts.
>
> But that presumption no longer controls when evidence is introduced that he may have a mental disease or defect.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> When the issue is raised, the mental condition of the defendant becomes a critical element in the case. The Government must then prove beyond a reasonable doubt either that the defendant had no mental disease or defect at the time of the act, or if he did, that his act was not the product of the disease or defect.

The Government's position is that the instruction was not plain error, citing Robinson (Joseph S.) v. United States, 136 U.S.App.D.C. 309, 420 F.2d 151 (1969) (rehearing en banc denied), cert. denied, 397 U.S. 977, 90 S.Ct. 1095, 25 L.Ed.2d 272 (1970), where a similar instruction was given.

Our reversal for other reasons does not preclude our consideration of the subject, notwithstanding the absence of objection, especially since this is a capital case. Nevertheless, we do not believe that in the circumstances the instruction given was reversible error. The real defense was insanity. Under the instruction the jury was required to consider the issue of appellant's sanity as a "critical element in the case." Furthermore, the instruction placed upon the

Government the burden of proving beyond a reasonable doubt that the crime was not the product of a mental disease or defect. We do not think that the failure to give an instruction that appellant be presumed insane, unless the Government prove the contrary beyond a reasonable doubt, prejudiced appellant in his defense.

## VII

In retrospect, it seems clear that in appellant's condition a mistake was made in giving him as much liberty as he had. This is not to say that the hospital authorities are to be criticized. The search for certainty about a patient's mental and emotional condition is often unavoidably impaired by the subtleties of the problem, at times involving undiscernible factors of causation in explaining conduct. A judgment reached in advance of events may be confounded by their occurrence. So it was in this case. Now, however, the situation is different. While for the reasons we have given we cannot approve the manner in which his present conviction was obtained, the record falls far short of demonstrating that appellant is no longer mentally ill or not likely to be dangerous to himself or others if at liberty.

Reversed and remanded.

McGOWAN, Circuit Judge (dissenting):

With all respect, the impressions I get from the record differ from those of the majority. The Government's case at trial depended almost exclusively on appellant's confession to the police; and it is around this confession that the two major issues on this appeal revolve. First, I am unpersuaded by the majority's primary ground for reversal, namely, that the trial judge erred in finding the confession to be voluntary and admissible. Second, I am unable to accept appellant's contention that the failure to bring to the jury's attention all the circumstances surrounding the confession constituted reversible error.

## I

Pursuant to Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), a pretrial hearing was held on the voluntariness of appellant's confession. Since all events surrounding the making of that final confession, including the three prior implicating statements, are relevant to the determination of its admissibility, it is necessary fully to review the 300-page pretrial transcript.[1]

A forty-year-old female employee of St. Elizabeths Hospital was brutally murdered on the morning of May 30, 1967. The body was found on a creek bed adjacent to the hospital grounds. Four detectives from the Metropolitan Police Department's Homicide Division launched an investigation, and, operating on the theory that the crime had been committed by either a present or former male patient at the hospital, they began to interview patients residing on the wards nearest the scene of the killing. During the first week of the investigation well over one hundred patients were questioned. Sergeant Preston, one of the detectives, had personally interviewed twenty-seven patients before his interview with appellant. At the end of that week the police had four or five prime suspects, among whom were the decedent's boy friend, and a patient who had recently eloped from the hospital and who had committed a similar crime in the past.

On the morning of June 5, a detective with the Park Police reported to the Homicide Division his recollection that a patient then in the hospital had been committed several years before after a verdict of not guilty by reason of insanity in a rape case in which the *modus operandi* was similar. Officer Preston attempted to familiarize himself with the facts of that case—known as the Fort Dupont case—but since the file was not then available, he read only the arrest sheet from which he was able to obtain a "sketchy" view of the facts.[2] Later that morning, he and two other police officers interviewed appellant for the first time. Sergeant Preston testified that before this initial meeting he did not view appellant as a serious suspect, both because "there were many patients with histories of similar types of assaults on file," and because the supervising doctor on appellant's ward related to the officers that she was certain that he could not have been out on the grounds on the morning in question.

The interview, conducted in a clerical office on the ward, lasted a little more than thirty minutes. The officers stated their purpose, no warnings were given, and appellant appeared calm and spoke freely. It was during this interview that Officer Preston "bluffed" appellant into his first implicating statement indicating that he might have been in the area of the crime on the morning of the 30th. It was also at this time that Officer Preston inquired about the scratch marks on appellant's arms, which he explained away as the result of an accident while hanging a basketball goal at his girl friend's home. Officer Preston testified that he could not give very serious weight to the scratches since his idea, that there may have been a struggle in

1. *See, e. g.,* Clewis v. Texas, 386 U.S. 707, 708, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).

2. At no point in the transcript are these asserted similarities between the two cases identified in detail. Indeed, while the Fort Dupont case led to a charge of forcible rape, the police reports and autopsy in this case negate any possibility of sexual molestation. The prosecution's version of the Fort Dupont case, as recounted by Dr. Blum, was that appellant clandestinely witnessed a woman having intercourse in the park. After the couple separated, appellant asked the woman to have relations with him. She refused and he raped her. Appellant's account of those events, as retold by one of the doctors who participated in the examination upon appellant's initial commitment in 1965, was that the woman, after agreeing to have intercourse with him, demanded payment. When appellant refused to pay, she accused him of raping her.

which the assailant was scratched, was "pure theory."

The majority finds that this interview was a custodial interrogation within *Miranda*, and that the inculpatory statement was inadmissible because no warnings were given and no waiver obtained. I disagree. The Supreme Court in *Miranda* made clear that its holding was "not intended to hamper the traditional function of police officers in investigating crime," and that "[g]eneral on-the-scene questioning * * * of citizens in the fact-finding process" [3] could be carried on without the cautionary warnings. Field interviews of the type involved in this case in which numerous persons are interviewed, all of whom may be said to be suspects but none of whom are viewed by the investigators as serious suspects because the investigation has failed to provide a basis for the focusing of peculiar attention on the persons inteviewed, do not present the compelling atmosphere of police domination and of significant restraint over the freedom of the individual that requires the protections of the prefatory warnings.

The contours of "custodial interrogation" are not sharply defined, and in cases of this nature there is no litmus paper test for determining when the warnings are required. This court has stated the problem in these terms:

> "Whether police have left the channel of 'investigation' and run onto the shoals of 'custodial interrogation' cannot be determined by reference to some chart clearly designating the various lights, bells, buoys and other channel markers. * * * We think the relative routineness of an inquiry is a material indicator that the police are still in a state of investigation. The police talk to too many people in the course of a day to make warnings compulsory every time they inquire into a situation. Such a requirement would hamper and perhaps demean routine police investigation. * * *"

Allen v. United States, 129 U.S.App.D.C. 61, 63–64, 390 F.2d 476, 478–479, supp. opinion, 131 U.S.App.D.C. 358, 404 F.2d 1335 (1968). This is a matter that must be handled on a case-by-case basis looking at all the relevant factors surrounding the interview, including "the relative routineness of [the] inquiry," [4] the degree to which the investigation has "focused" on the accused,[5] the "atmosphere" of the interview,[6] and the quantum of restraint exercised over the interviewee's freedom of movement.[7] Viewing these factors in the light of this record, I do not find here the in-custody interrogation that would invoke *Miranda*.

---

3. Miranda v. Arizona, 384 U.S. 436, 477–478, 481, 86 S.Ct. 1602, 1629, 6 L.Ed.2d 694 (1966).

4. 129 U.S.App.D.C. at 64, 390 F.2d at 479.

5. The concern with focusing is a carryover from Escobedo v. Illinois, 378 U.S. 478, 490–491, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977 (1964), which held that Sixth Amendment rights arise when "the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular subject." A somewhat unclear footnote in *Miranda* indicates this concept was considered to be synonymous with the test for custodial interrogation. 384 U.S. at 444 n. 4, 86 S.Ct. 1602. It is generally agreed among the circuits, however, that while focus is a relevant consideration, it is not, by itself, a conclusive test. *See, e. g.,* United

States v. Hall, 421 F.2d 540, 543 (2d Cir. 1969), cert. denied, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970); United States v. Gibson, 392 F.2d 373, 375–376 (4th Cir. 1968).

6. The majority opinion in *Miranda* discusses at length the degree to which the atmosphere of the stationhouse interrogation itself compels incrimination. For a good discussion of the "atmosphere" and "focusing" elements of the custodial interrogation concept, *see* Comment, The Early Warning System in Criminal Tax Investigations, 118 U.Pa.L.Rev. 795, 800–802 (1970).

7. Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (the accused may be in custody for purposes of *Miranda* even in his own home under some circumstances).

This is not to say, however, that the implicating statement might not be involuntary irrespective of *Miranda*. Police trickery eliciting incriminating statements is not to be condoned at any stage of investigation. Tactics of this sort were among the practices deplored in *Miranda*. Yet the Supreme Court has never adopted an exclusionary rule for confessions occasioned by such tactics.[8] Last Term that Court, in Frazier v. Cupp, 394 U.S. 731, 737–739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), held a confession admissible despite the fact that police trickery during the interrogation contributed to the making of the statement. It has long been the practice of the federal courts in pre-*Miranda* cases, and I assume now in post-*Miranda* noncustodial interrogation cases, to ascertain the voluntariness of an admission by examining all the circumstances surrounding the statement, according to no single factor the exclusionary effect that would obviate consideration of the totality of circumstances.[9] It is unnecessary, however, for this court to decide whether this first statement by appellant was voluntary and admissible, since no attempt was made by the Government to place that statement before the jury. The questionable voluntariness of this initial admission is only one of the factors that the court should weigh in evaluating the voluntariness of the formal confession that was introduced.[10]

8. Rogers v. Richmond, 365 U.S. 534, 541–545, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), is instructive in this regard. There the Supreme Court held that, if a trick or deception occasions an involuntary statement, that statement may not be admitted merely on the reasoning that despite the trickery it is nonetheless true and reliable. Due process, held the Court, demands that the determination of voluntariness must be made without reference to reliability or credibility. It is clear, however, that the Court did not hold that the fact that a confession was obtained by deception rendered it *ipso facto* involuntary.

9. *See, e. g.,* Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

10. The majority relies on Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), for the proposition that the implicating statement by appellant to Officer Preston is inadmissible because it was given in response to an accusation by a police officer. The Supreme Court was, however, careful to preface its holding with the following statements:
"[A]ll the decided cases necessarily rest upon the state of facts which existed in the particular case, and, therefore furnish no certain criterion, since the conclusion that a given state of fact was adequate to have produced an involuntary confession does not establish that the same result has been created by a different although somewhat similar condition of fact. * *

[T]here [is] no general rule of law by which the admissibility of a confession could be determined, * * * the courts [have] left the rule to be evolved from the facts of each particular case. * * * [W]hether a confession [is] voluntary [is] primarily one of fact, and therefore each case must depend upon its own proof."
168 U.S. at 548–549, 18 S.Ct. at 189. The Court thereafter recited all the facts tending to show involuntariness: (1) Bram had been accused of a murder while at sea and had been placed in irons by the crew; (2) he was delivered to the police authorities upon landing; (3) he was placed in confinement to await action by the United States consul; (4) he was taken to the private office of the police interrogator; (5) he was stripped of his clothing by the detective; and (6) while denuded he was told by the detective that he had been seen committing the act in question. The Court then concluded:
"Although these facts may not, when isolated each from the other, be sufficient to warrant the inference that an influence compelling a statement had been exerted; yet, when taken as a whole, in conjunction with the nature of the communication made, they give room to the strongest inference that the statements * * * were not made by one who, in law, could be considered a free agent."
168 U.S. at 563–564, 18 S.Ct. at 195. Thus the Court both restates the totality of the circumstances test, and cautions against reliance by one court on any single factor suggested by another court under other circumstances to demonstrate

Following this initial interview, Sergeant Preston talked to one of the attendants who appellant admitted had seen him on the morning of the crime, and ascertained that appellant had been seen in the general vicinity, although the time did not square with the time the officers thought the murder had taken place.[11] That afternoon the officers again interviewed appellant, this time for about two hours, in an effort to learn more about his activities on the 30th and to find out whether, if he was not personally involved, he might have seen someone else in the vicinity that morning. The same officers were present; appellant indicated no reluctance to speak; and he did not appear anxious or nervous.

The officers told appellant that he was free to leave at any time and that he did not have to talk to them. Appellant spoke freely about his hostility toward women, the Fort Dupont case, and the source of his scratches. At the conclusion of the interview, no arrest was made because, as Officer Preston testified, appellant had told him nothing upon which he felt he could base an arrest. The interviews with appellant occasioned no change in the course of the wider investigation. Four officers continued to interview patients for several more days, and Officer Preston talked to three more patients before he was taken off the case two days later.

On June 6 appellant was transferred to the maximum security ward. The hospital personnel testified that this was occasioned by his possible involvement in the unsolved crime *and* by the knowledge, gained from his interviews with the police, that he had been violating his open-ward privilege by leaving the grounds. There is no testimony that the police had requested the hospital to return appellant to maximum security rather than arresting him, or that, but for his recommitment, an arrest would have been made. Indeed, there is no indication that Officer Preston talked to any hospital officials about appellant between the end of the second interview on June 5, and June 7, when he and other police officers spoke to Dr. Owens. Officer Preston testified that he was well aware that a number of patients on the open wards were "wandering about the neighborhood * * * off the grounds." Indeed, appellant told the officers that he often left the grounds to see his sister or his girl friend. Certainly if Sergeant Preston had felt that he had probable cause to believe that appellant had committed this murder he would have made an arrest at that time or made explicit provision for his immediate incarceration at the hospital.

Nevertheless, the majority appears to assume that probable cause to arrest did exist at this juncture, and that appellant should have been taken before a magistrate in compliance with Rule 5(a) Fed. R.Crim.P. Again, I must disagree. Whether probable cause to arrest exists is often a close question requiring the exercise of judgment. The sanction of the exclusionary rule dictates caution in cases such as this in which the question is not free from doubt. This record does not, as I read it, tell a story of police officers, with a purpose to prolong opportunities for improper investigation, deliberately delaying arrest and presentment of a suspect whom they were reasonably certain was the man responsible for the slaying.[12]

---

involuntariness. It expressly disclaims any purpose to promulgate a rule that all implicating statements occasioned by police deception are *per se* involuntary and inadmissible under the Fifth Amendment.

11. The police investigation determined that the crime occurred before 10:00 a. m. The attendant interviewed by Officer Preston indicated that he and another attendant saw appellant twice between 11:00 and 11:30 a. m.

12. It has long been the rule in this jurisdiction that a claim of denial of Rule 5(a) procedures must be raised through an objection to the admission of the confession. In this case there was no objection at trial and the *Mallory* point was

During the five-day interval between June 5 and the confession to Dr. Blum on June 10, a number of events occurred which are relevant to the voluntariness issue. Appellant was returned to maximum security on the 6th; Dr. Owens talked to the police about appellant on the 7th; pictures were taken of his scratches on the 7th; and on the 8th Dr. Owens talked to appellant and suggested that he submit to a truth serum test to clear himself of suspicion (a suggestion he rejected). Then, on June 10, appellant requested one of the attendants to call his psychologist, Dr. Blum, at home and ask that he come to the hospital to talk to him. When Dr. Blum arrived, appellant immediately told him the entire story. He was in a very emotional state and was crying profusely. Dr. Blum testified at length about why appellant told him of his crime:

> "I felt that he had no other recourse but he had to tell me. It was more of a *compelling kind of thing*, there, then, that *he had to tell me.*
>
> * * * * * *
>
> So he was, I mean, excited, I think, by a lot that was going on within him.
>
> * * * * * *
>
> [T]here was a gush of feeling, that accompanied this, which never accompanied anything else he has talked about, so, I assume that there was *some inner turmoil* which prompted this man to tell me about this." (Emphasis supplied).

In spite of these repeated and uncontroverted assertions that the confession was the result of some "compelling need" or "inner turmoil," the majority finds that the confession was instead the product of the pressure of all the events that preceded it—the trickery, the interviews, the recommitment to maximum security, and the suggestion of a truth serum test. Nowhere in the record is this conclusion suggested. Neither appellant nor Dr. Blum ever indicated that any mounting pressure of events or continued focusing compelled him to give in or weakened his will. Contrarily, all the testimony supports the Government's summation at the pretrial hearing that "[t]he stimuli for these confessions * * * are his own internal consciousness, perhaps his guilt, his remorse, whatever it is that operates in a human being after a crime of this kind has been committed." On this record I am unable to ascribe error to the trial judge's finding that this confession to Dr. Blum was voluntary.

After confessing to Dr. Blum, appellant sought his advice and was counseled to make a "clean breast of it" and tell his story to the director of the maximum security ward. Pursuant to that advice, an interview was scheduled for the 12th of June with Dr. Owens. At that time appellant repeated his confession. The trial court also found this confession voluntary but did not make findings resolving either the dispute in the testimony between Doctors Owens and Blum whether the warnings preceded or followed appellant's confession, or the dispute whether the warning given stipulated that whatever appellant said might be used against him.[13] Since, as with the Blum confession, we do not have a custodial interrogation situation, any inquiry about formal warnings goes only to the voluntariness question.

Now we reach the confession used by the Government at trial. At the conclusion of the confession to Dr. Owens, ap-

---

not pressed on appeal. *See* Johnson v. United States, 110 U.S.App.D.C. 187, 290 F.2d 378 (1961); 1 C. Wright, Federal Practice & Procedure § 73, at 78 (1969).

13. Dr. Owens recounted the telephone conversation he had with an Assistant United States Attorney before the interview on the correct procedure for preserving the rights of the accused and assuring the constitutional validity of whatever statement appellant might make. He testified that he was careful to give all the warnings exactly as they were passed along to him by the United States Attorney, and that he gave the warnings before appellant began to speak. Dr. Blum was just as certain that no warnings were given until after the confession.

pellant was asked whether he wished to tell his story to the police. He said he did, and the officers were called in. The following evidence was adduced regarding the admissibility of this confession. It was preceded by the full warnings from the police and several admonitions by Dr. Owens that he could have an attorney if he desired one. Appellant indicated that he understood his rights and did not desire an attorney.[14] Having had a rather extended history of contact with the law and the judicial process,[15] appellant could appreciate the function of the policemen and that his confession would have serious consequences. There was testimony that appellant probably did not anticipate that he would be removed from the hospital to serve a prison term but thought that he "would be at St. Elizabeths for the rest of his life." Since ap-

pellant only a few days earlier had before him the prospect of unconditional release, he cannot have failed to appreciate that his confession would have a significant impact on his future.[16]

The record also leaves little question about appellant's capacity or competence to make a voluntary confession. Both doctors testified unequivocally that he was competent, and it appears clear from the evidence of his long career at the hospital that, whatever delusions or emotional instability triggered his violent hatred for women, they did not impair his ability to comprehend his circumstances and to understand the serious consequences of his confession.[17]

The background of this confession has been examined at some length because I believe, as does the majority, that the mere incantation of the appropriate cau-

14. The majority opinion intimates that a question exists as to whether there was clear and convincing proof of waiver of those rights. Insofar as any competent patient in a mental institution may be said to waive his rights, appellant clearly did so here. There is not to my knowledge any judicial or statutory requirement that all inmates in hospitals of this type must be supplied with counsel as an absolute condition precedent to the use of any statement they may make. I do not understand the majority to suggest such a result.

15. *See, e. g.*, Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 20 L.Ed. 2d 77 (1968) (dissenting opinion).

16. Dr. Owens testified at the pretrial hearing that appellant had originally been transferred out of maximum security as the first step toward his eventual release, and that, once he proved that he could satisfactorily handle the increased responsibilities associated with ground privileges, he would have been "recommended to the Court for conditional release." Dr. Blum, after recounting the normal hospital procedures leading to release, testified at trial that appellant "was leading towards * * * a conditional release, and then ultimately if his adjustment was very good, an unconditional release." The record further makes clear that appellant knew that he was being considered for eventual release. Dr. Owens testified at trial that appellant understood "he was being transferred

out of maximum security to accept additional responsibilities on his own." Robert Lee White, one of the ward attendants who often spoke with appellant, also testified that he talked often about his plans to be married after his release.

17. Appellant's medical history and diagnosis at the time of the crime and confession present a striking contrast to the evidence in Blackburn v. Alabama, 361 U.S. 199, 207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960), which was said to establish indisputably "the strongest probability that [defendant] was insane and incompetent at the time he allegedly confessed." The evidence in this case presents a different picture. Appellant's initial diagnosis in 1965 was "schizophrenic reaction, undifferentiated type." Some eight months later the diagnosis was changed to "emotionally unstable personality," because appellant had never exhibited the symptoms of schizophrenia and the initial evaluation was erroneous. Approximately 15 or 16 months later he was transferred out of maximum security to an open ward. Appellant had been a "model" and "exemplary" patient. The officials were encouraged by his adaptation to the hospital environment and by his seeming suppression of his delusions about women. At no point in his medical history had his sporadic emotional responses against women so pervaded his mind as to interfere with his abilities of comprehension and communication.

tionary phrases demanded by *Miranda*, coupled with an intelligent waiver, should not dictate, by themselves, a conclusion that the confession obtained was freely and voluntarily given. While the failure to give the warnings requires automatic exclusion, the giving of the warnings does not prevent the trial judge from independently considering whether the confession was voluntary by reference to the totality of circumstances. It is especially mandatory in cases like the one before us, in which much of the investigation takes place prior to any stage that could be called "in-custody interrogation," that such a review apart from *Miranda* be undertaken. In the ordinary case the same factors that would lead to a finding of involuntariness may well compel a finding that the waiver under *Miranda* was not freely and intelligently given, and in those cases no separate consideration of voluntariness may be required. However, when cases arise like this one, neither the sufficiency of the warnings nor the definiteness of the waiver should preclude examination of the question whether the underlying admission was voluntary.[18]

Viewing the confession admitted against appellant in the totality of the circumstances exposed by the pretrial hearing record, I am unable to conclude that the trial judge's findings on voluntariness were clearly erroneous.[19]

## II

The court having found the confession voluntary, it was properly introduced by the Government at trial. There is now some confusion regarding the standard that should have been applied by the jury in considering this confession. The rule established in Clifton v. United States, 125 U.S.App.D.C. 257, 263, 371 F.2d 354, 360 (1966), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967), and reaffirmed in Pea v. United States, 130 U.S.App.D.C. 66, 397 F.2d 627 (1968), is that the jury must find the confession voluntary beyond a reasonable doubt before it may be considered as evidence of guilt. The trial judge here only instructed the jury that they must decide whether the confession was freely and voluntarily given, without stipulating that its finding must be beyond a reasonable doubt. The judge did, however, instruct that guilt must be found beyond a reasonable doubt, and that each element of the offense must also be found beyond a reasonable doubt. Although this is not the preferred method for framing the voluntariness instruction, *Clifton* indicates that, in cases in which the confession is the central element, this instruction would not create reversible error:

> "In his charge to the jury * * * the District Judge did not specifically single out the confession, apart from the other evidence, and define the standard applicable to it. We note, however, that the confession was in fact the essence of the Government's case. The Judge instructed the jury that the Government had the burden of proving beyond a reasonable doubt

18. This is the same procedure for review of confessions set out in Section 3501(b) of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 3501(b) (Supp. V, 1970) (see complete text of this Sub-section in footnote 10 of the majority opinion). The legislative history of this statute suggests that Congress desired to resurrect the "totality of circumstances" test for *all* confessions, and to override the exclusionary impact of *Miranda* in cases in which custodial interrogation was not prefaced with the requisite warnings. 2 U.S.Code Cong. & Admin.News, 2112, 2124–2138, 2210–2215, 2261–2263 (1968). While this Sub-section is subject to grave constitu-

tional doubts (*see* Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the constitutional question will be presented only in a case in which the warnings were *not* given in an in-custody interrogation and the trial court finds the confession nonetheless admissible. This is not that case.

19. The established rule for reviewing confessions under the "totality of circumstances" test is that "where there is a genuine conflict of evidence great reliance must be placed upon the finder of fact." Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960).

that the defendant was guilty and had committed every element of the offense charged. It does not seem possible to us that the jury would have failed to understand that in order to convict they must believe beyond a reasonable doubt both its voluntariness and its substance, *i. e.*, the truth of the facts recited in the confession." [20]

The requirement of determination of voluntariness by the jury is one aspect of the two-step procedure under the *Clifton-Pea* rule which requires that both the judge and the jury make separate findings of voluntariness beyond a reasonable doubt before a confession may be considered as evidence in the case. This is an application of the Massachusetts Rule recognized in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), as one of the constitutionally acceptable procedures for handling confessions at the trial court level.

Jackson v. Denno also sanctioned another approach, known as the Orthodox or Wigmore Rule, under which, once the judge makes the preliminary finding of voluntariness, the jury does not make another independent finding on that issue. Under this procedure, the jury only hears evidence on the circumstances surrounding the confession to aid it in determining the *weight* or *credibility* of the confession. Insofar as the jury believes a confession to have been involuntarily given, possibly as the result of threats, promises, or trickery, it might question the truthfulness of the statement and discount its weight. The central difference between the two approaches as far as the jury is concerned is that under the former the jury must find the confession voluntary before passing on its credibility, while under the latter the jury is not called on to consider separately the voluntariness of the confession.

Congress, in enacting Title II of the Omnibus Crime Control and Safe Streets Act (effective June 19, 1968),[21] appears to have prescribed the Orthodox Rule as the procedure to be used by all federal and District of Columbia courts. The trial judge is instructed to hold a Jackson v. Denno-type hearing to determine voluntariness. If he finds a confession to be voluntary, it is admissible, as is also evidence bearing on its voluntariness. The judge is to instruct the jury to give the confession such weight as it feels the confession deserves under all the circumstances. This is the classic division of responsibility between judge and jury under the Orthodox practice: the judge determines voluntariness or competence, while the jury assesses weight or credibility. There does not appear to be any constitutional impediment to Congress's adoption of this procedure since it represents one of two procedures approved by Jackson v. Denno and will bring uniformity to an area that has heretofore been the subject of disparate treatment by the federal circuits.[22]

Neither the parties nor the trial judge seem to have been relying on this statute, even though the trial occurred eight months after its effective date. Instead, they continued to apply a standard more favorable to the accused, requiring a jury determination of voluntariness before it could consider the weight to be accorded the confession. Since the *Clifton-Pea* Rule, and the instruction that voluntariness must be found beyond a reasonable doubt, affords the accused a second chance not offered by the statutory procedure,[23] we cannot reverse on

**20.** 125 U.S.App.D.C. at 260, 371 F.2d at 357.

**21.** 18 U.S.C. § 3501(a) (Supp. V, 1970). For the full text of Section 3501(a), *see* Note 17 of the majority opinion.

**22.** 378 U.S. at 382, 399-400, 84 S.Ct. 1774.

**23.** Although the question whether the Massachusetts or Orthodox procedure provides criminal defendants the greater protection is not free from doubt, the "protection of two independent determinations of voluntariness, by judge and jury" appears to make the Massachusetts view preferable from the standpoint of the

the ground that appellant was prejudiced by the trial judge's failure to give the less favorable instruction that the jury should "give such weight to the confession as the jury feels it deserves under all the circumstances."

There is, however, one further problem. Under either rule, evidence of the events surrounding the confession is relevant to a determination either of voluntariness (under the *Clifton-Pea* approach) or in evaluating the weight to be given (under the Orthodox-Section 3501 (a) procedure).[24] At trial, however, most of the evidence bearing on voluntariness heard at the suppression hearing was not reintroduced. The Government introduced only the formal confession made to the police officers on June 12, along with evidence of the circumstances immediately surrounding that confession. None of the evidence of the events of the preceding week, including the three prior admissions, was adduced before the jury by either side. Appellant now contends that, since the jury was required to make a finding on voluntariness, it was the duty of either the defense counsel or the trial judge to assure that all the testimony relevant to that jury determination was introduced. Appellant's conclusion is that this failure constitutes *plain error requiring reversal* under Fed.R.Crim.P. 52(b).

Because, as will be demonstrated herein, our two-step procedure for evaluating confessions does not command the complete re-presentation at trial of all the evidence on voluntariness, I can find no reversible error in this case so long as it appears that (1) defense counsel was aware that his unsuccessful attack on the admissibility of the confession at

the pretrial stage in no manner precluded him from introducing favorable evidence on the voluntariness issue at trial, and (2) his failure to do so was in all likelihood a conscious and reasoned one. Both counsel's awareness of alternatives and the presence of a defensible tactical basis do appear here.

In order to demonstrate conclusively that no reversible error exists, the case on voluntariness at trial must be examined from two points of view: (1) where the evidence would have been considered by the jury on the preliminary issue of voluntariness as well as on the question of reliability, and (2) where the evidence would only have been relevant to determining credibilty. The first then is an examination of the case as it was handled by the trial judge (using the *Clifton-Pea* procedure) and the second is an examination of the case as it should have been handled if the statutory rule had been followed.

Even where the jury is required to make a finding on voluntariness, it was never contemplated that the trial would be a complete duplication of the evidence heard by the judge at the pretrial hearing. Indeed, one of the primary reasons for having a preliminary determination out of the presence of the jury is to assure that all the evidence on voluntariness will be heard by one trier of fact without the risk that such evidence would prejudice some substantive issue in the case. This is one of the reasons underlying the holding in Jackson v. Denno, and Judge Leventhal's opinion in *Clifton*,[25] that it is the pretrial determination by the judge that is the ultimate in terms of constitutional significance rather than the subsequent redetermination by the jury. As Judge Leventhal

accused. This is especially true in jurisdictions which require the initial finding to be beyond a reasonable doubt. Meltzer, Involuntary Confessions: The Allocation of Responsibility Between Judge and Jury, 21 U.Chi.L.Rev. 317, 329–30 (1954).

24. The statute states that
 "the trial judge shall permit the jury to hear relevant evidence on the issue

of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances."
18 U.S.C. § 3501(a) (Supp. V, 1970).

25. Judge Leventhal's concurring opinion in *Clifton* became the basis for overruling *Clifton* in *Pea*.

has pointed out, probably the clearest example of this disparity in evidentiary presentation is the testimony of the defendant himself:

"Practical considerations of proof underscore the importance of the court's use of the reasonable-doubt standard, notwithstanding a later submission to the jury. There may be more evidence before the court than before the jury, for example the testimony of a defendant who dare not risk presentation of prior convictions to the jury [elicited through impeachment on cross-examination]."[26]

This case is an example of that disparity. Defense counsel asked appellant to testify at the pretrial hearing in an unsuccessful effort to persuade the trial judge that his confession was the product of merely following his psychologist's and the hospital's orders rather than the result of a voluntary decision on his part. Whatever defense counsel's reasons for not wishing to subject appellant to cross-examination and impeachment at trial, there would seem to be no question of his right to remain silent and forego the opportunity to present that voluntariness theory to the jury.

Turning to other pretrial testimony that was not duplicated before the jury, it becomes apparent that there are defensible tactical reasons explaining why there was "more evidence before the court than before the jury." For instance, defense counsel introduced Dr. Blum's testimony regarding the June 10 confession at the pretrial hearing but not at trial. Since it was this testimony which convinced the trial judge that the confession was the result of an "inner turmoil" or something "within him," I cannot say that there is no tactical basis for a decision not to reintroduce that damaging testimony. Likewise, had the defense introduced the testimony regarding the Blum and Owens confessions, the Government surely would have given greater emphasis to the doctors' conclusions that appellant was mentally competent to make those confessions and to waive his *Miranda* rights.[27] Not only might their testimony have failed to bolster the involuntariness claim, but it might well have also prejudiced the insanity defense. Can we say that defense counsel lacked judgment if he concluded that the jury might be unable or unwilling to differentiate between the mental-disease-or-defect issue, on the one hand, and the competency-to-confess issue, on the other? Might not defense counsel have feared the jury's speculating, once it learned that it was uncontroverted that appellant was competent to confess on June 10 and 12, that he was not insane two weeks before when he committed the act? Good trial lawyers are separated from bad in their alertness to such considerations as these.

26. 125 U.S.App.D.C. at 266, 371 F.2d at 363. *See also* Jackson v. Denno, 378 U.S. at 389 n. 16, 84 S.Ct. 1774.

27. At the pretrial hearing, both Dr. Blum and Dr. Owens testified that there was nothing whatsoever to indicate that appellant was incompetent with respect to any of the three confessions. When the Government asked Dr. Owens at trial whether it was his conclusion that appellant was competent to make the formal confession to the police, defense counsel objected and explained to the judge (out of the hearing of the jury) that he did not think the Government should go into the question of competency since defense counsel had "never contended [appellant] wasn't competent." His objection was overruled, and Dr. Owens testified about appellant's ability to understand the warnings and to comprehend the significance of his confession to the police. Doctor Blum did not testify on the competency issue at trial since the confession made to him was not introduced. Likewise, Dr. Owens did not testify on appellant's competence to make the confession to him. It is clear that at least one of the reasons underlying defense counsel's objection to permitting the jury to hear the evidence on competency was the negative effect it might have on the insanity defense. If defense counsel at trial had introduced the other confessions, as appellant's counsel on appeal suggests he should have done, the Government would surely have introduced the repeated assertions of both doctors that appellant was competent voluntarily to make all three confessions.

Furthermore, defense counsel must have considered what impact or cumulative effect the introduction of four confessions rather than one would have had on the jury. Jackson v. Denno emphasizes that one of the reasons why due process requires an independent determination of voluntariness by the judge is the practical knowledge that jurors often fail to distinguish between reliability and voluntariness, *i. e.*, the stronger the certainty that the confession is truthful, the less sympathy the jury is likely to have for the involuntariness claim.

> "The jury * * * may find it difficult to understand the policy forbidding reliance upon a coerced, but true, confession * * *. That a trustworthy confession must also be voluntary if it is to be used at all, generates natural and potent pressure to find it voluntary. Otherwise the guilty defendant goes free." [28]

Defense counsel could well have weighed his case on voluntariness against these factors of cumulative and negative impact—both on the voluntariness and insanity defenses—and reasonably have concluded not to renew this issue.

Certainly his judgmental decision, even if proven by the subsequent outcome to have been erroneous, falls far short of the ineffective representation that could be said to have deprived appellant of a fair trial. The effectiveness of counsel is not, in any event, to be measured by his success. This court, in reviewing its standards for effective assistance of counsel, has made clear that

> "[m]ere errors of judgment as disclosed by subsequent events are not sufficient to establish ineffective assistance of counsel. Nor is it the function of the court 'to evaluate the relative efficacy of trial tactics.' " [29]

It should be clear both that Jackson v. Denno and *Clifton* never contemplated an invariable duplication of evidence at trial, and that there does exist in this case a substantial tactical basis for defense counsel's decision.

Despite the presence of this tactical basis for a decision not to pursue the voluntariness issue before the jury, I would be reluctant to rely on the existence of these considerations if I were not convinced on this record that defense counsel was well aware of his opportunity to re-open the voluntariness question at trial and, therefore, must have considered these factors. The record does impress me as supporting the proposition that defense counsel was fully cognizant of the precedents establishing the two-step procedure followed heretofore in this jurisdiction. At the suppression hearing, counsel cited the landmark case of Jackson v. Denno. Indeed, counsel referred to it three times. Also, during the course of his argument to the court at the conclusion of the suppression hearing, counsel four times referred to our rule that voluntariness must be found beyond a reasonable doubt. For instance, in his final remarks he argued that the "statements made to the police were not voluntarily given beyond a reasonable doubt, *which is the standard adopted in this jurisdiction.*" He, therefore, must have been familiar with our decision in *Pea* which established this standard. It defies belief that defense counsel could have been acquainted with these two precedents and not have known that an unsuccessful attack on voluntariness before the judge would not bar representation of that defense before the jury.

Again, the transcript indicates that he was aware that the issue of voluntariness was to be submitted to the jury, and that the jury would be instructed to make a finding on that issue. Two days before the jury instructions were given, the judge asked the parties what instruc-

28. 378 U.S. at 382, 84 S.Ct. at 1783, 12 L.Ed.2d 908.

29. United States v. Hammonds, 138 U.S. App.D.C. 166, 425 F.2d 597, 601 (1970) ; Mitchell v. United States, 104 U.S.App. D.C. 57, 62–63, 259 F.2d 787, 792–793, cert. denied, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958).

tions they would request, and defense counsel, after discussing the need for insanity and manslaughter instructions, stated: "Of course the Court will give an instruction on confessions and voluntariness. * * *" After the instructions had been given to the jury, defense counsel objected to the form of the voluntariness instruction on *Miranda* grounds (and persuaded the court to alter its instruction), but at no time did he indicate any surprise that the jury was being asked to make a separate finding that the confession was voluntary. The transcript most convincingly establishes that defense counsel's failure to pursue the voluntariness issue at trial could not have been the product of ignorance of the procedure followed in this jurisdiction.

Furthermore, under these circumstances I am unable to accept appellant's argument faulting the trial judge for not demanding that the evidence be introduced. If this were a case in which it should have been apparent to the trial judge that appellant's court-appointed counsel was unaware of controlling precedents and established procedures, there would be merit to a suggestion that responsible trial judges should inquire into the underlying assumptions of defense's trial strategy. Where, however, it is clear to the judge, as it must have been here, that defense counsel is cognizant of pertinent legal principles, no such duty of inquiry exists, and there can be no reversible error derived from the failure of the transcript to reflect a court-counsel colloquy.

There is even less ground for error under Section 3501(a). Although that Section contemplates the introduction of evidence of voluntariness, it is clear that its sole purpose is to assist the jury in determining weight or credibility, which is the only issue the jury is called upon to decide under the statute. As Justice White explained in Jackson v. Denno:

> "[T]he evidence surrounding the making of a confession bears on its credibility [and] is presented to the jury under the orthodox rule not on the issue of voluntariness or competency of the confession, but on the issue of its weight." [30]

A jury under the statutory-Orthodox procedure may review evidence, such as the existence of threats, coercion, or promises, and conclude that the confession is of questionable reliability. What evidence could defense counsel in this case have introduced that might have provided a basis for discounting the truthfulness of this confession? There simply is no ground for urging its untrustworthiness. Acquainting the jury with the entire chain of admissions, running from the June 5th interviews to the formal confession one week later, would only have certified its reliability.[31]

Appellant has also argued that he was prejudiced in the preparation of his insanity defense due to the delay in appointment of counsel. Ordinarily, a delay of seven months would raise serious questions about a defendant's ability to prepare his insanity defense. Here, however, appellant was incarcerated in St. Elizabeths under psychiatric care both before and after the commission of the crime. The record is replete with medical testimony regarding his mental status and the delusions underlying his violent act. Under these special circumstances, I do not believe appellant was seriously prejudiced.

---

30. 378 U.S. at 386 n. 13, 84 S.Ct. at 1786.

31. While the Supreme Court has held unconstitutional the consideration of trustworthiness by the fact-finder in the determination of voluntariness (Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)), the converse is not unconstiutional, *i. e.*, there is no constitutional impropriety in the fact-finder's consideration of voluntariness in deliberations regarding the confession's trustworthiness.